# EXHIBIT

# B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TAMESHA MEANS,

               Plaintiff,

vs.

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS, a not-for-profit
corporation, STANLEY URBAN, ROBERT
LADENBURGER, and MARY MOLLISON,

               Defendants.

_____/

Hon.

Case No.

**JURY TRIAL DEMANDED**

Brooke A. Merriweather-Tucker
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6823
btucker@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

Louise Melling
Jennifer Dalven*
Alexa Kolbi-Molinas*
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2633
lmelling@aclu.org
jdalven@aclu.org
akolbi-molinas@aclu.org

*Applications for admission forthcoming

Don Ferris (P26436)
Heidi Salter-Ferris (P41481)
Cooperating Attorneys, American Civil
  Liberties Union Fund of Michigan
Ferris & Salter, P.C.
4158 Washtenaw Ave.
Ann Arbor, MI 48108
(734) 677-2020


Attorneys for Plaintiff

## COMPLAINT

## INTRODUCTORY STATEMENT

1.     Plaintiff Tamesha Means brings this negligence action against the United States

Conference for Catholic Bishops and others for promulgating and implementing directives that

cause pregnant women who are suffering from a miscarriage to be denied appropriate medical

care, including information about their condition and treatment options.  These mandates, known

as the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), do not

merely set forth the opinions of the United States Conference of Catholic Bishops ("USCCB")

on certain health care issues.  Rather, the Directives require Catholic hospitals to abide by their

terms, even when doing so places a woman's health or life at risk.  Ms. Means, one of many

patients whose health has been unnecessarily placed at risk, brings this action to redress the

trauma and harm she suffered at a Catholic hospital because of the Directives.

2.     In December 2010, when Ms. Means was only 18 weeks pregnant, her water broke.

She rushed to Mercy Health Partners ("MHP"), a Catholic hospital and the only hospital within

thirty minutes of her home.  Because of the Directives, MHP did not inform Ms. Means that, due

to her condition, the fetus she was carrying had virtually no chance of surviving, and continuing

her pregnancy would pose a serious risk to her health.  Nor did MHP tell Ms. Means that the

safest treatment option was to induce labor and terminate the pregnancy.  MHP also did not tell

Ms. Means that it would not terminate her pregnancy, even if necessary for her health, because it

was prohibited from doing so by the Directives.  Instead, MHP sent Ms. Means home and told

her to see her doctor at an appointment scheduled for more than a week later.

3.     Ms. Means returned to MHP the next day, bleeding and with painful contractions.

Again, MHP sent her home without giving her important information about her condition and

available treatment options.  She returned that night, in pain, in distress, and with signs of an

2

infection. MHP again prepared to send her home. As she waited to be sent home for the third time, the feet of the fetus breached her cervix and she began to deliver. The baby died shortly after birth. MHP then told Ms. Means she needed to make funeral arrangements.

4.     Ms. Means brings this negligence action against Defendants for their roles in promulgating the Directives and directing MHP to adhere to them. As a direct result of these religious Directives, Ms. Means suffered severe, unnecessary, and foreseeable physical and emotional pain and suffering. She seeks both damages and a declaration that Defendants' actions were negligent, not only to provide a remedy for the trauma she suffered, but also to prevent other women in her situation from suffering similar harm in the future.

## PARTIES

5.     Plaintiff is a resident and citizen of the State of Michigan.

6.     Defendant United States Conference of Catholic Bishops ("USCCB") is a not-for-profit corporation incorporated in the District of Columbia. USCCB's headquarters and principal place of business is located in the District of Columbia. Pursuant to 28 U.S.C. § 1332(c), USCCB is a citizen of the District of Columbia.

7.     Defendant Stanley Urban is a resident and citizen of the State of Pennsylvania. Urban is the Chair of Catholic Health Ministries, an unincorporated foreign entity that is the religious sponsor of MHP.

8.     Defendant Robert Ladenburger is a resident and citizen of the State of Colorado. Ladenburger was the Chair of Catholic Health Ministries in 2010.

9.     Defendant Mary Mollison is a resident and citizen of the State of Wisconsin. Mollison was the Chair of Catholic Health Ministries in 2009.

3

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction is proper under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

11.     The decision that MHP would adhere to Defendant USCCB's Directives was made by Catholic Health Ministries in the Eastern District of Michigan.  Accordingly, venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred within the Eastern District of Michigan.

## FACTS

**Plaintiff's Experience at Mercy Health Partners**

12.     Plaintiff became pregnant in the summer of 2010.  At that time Plaintiff had three children.

13.     On the morning of December 1, 2010, Plaintiff's water broke and she began having contractions.

14.     Plaintiff, who does not have a car, called a friend for a ride and immediately went to MHP.

15.     MHP is the only hospital in Muskegon County, Michigan.

16.     At the hospital, Plaintiff was given an ultrasound and the pregnancy was dated at 18 weeks.  The ultrasound also revealed that the fetus had a heartbeat.

17.     Plaintiff's ultrasound report indicates Plaintiff had an amniotic fluid index of only 3.4 and a condition called oligohydramnios, which refers to a decreased volume of amniotic fluid due to the premature rupture of membranes.

4

18.   MHP also diagnosed Plaintiff with preterm premature rupture of membrane, a condition in which a woman's amniotic sac ruptures with a gestation less than 37 weeks.

19.   MHP informed Plaintiff that the fetus was not yet viable.

20.   MHP did not inform Plaintiff that in most cases, an amniotic fluid index of 3.4 at 18 weeks of pregnancy, in the context of premature rupture of membranes, means that the fetus will either not be born alive or will be born alive and die very shortly thereafter.

21.   MHP did not inform Plaintiff about the serious risks to her health if she attempted to continue the pregnancy.

22.   MHP did not raise or discuss with Plaintiff the option of terminating her pregnancy, despite the risks to her health of continuing the pregnancy, nor the fact that the fetus she was carrying had almost no chance of survival.

23.   MHP did not inform Plaintiff that MHP's policy does not permit it to help Plaintiff complete the miscarriage, e.g., by inducing labor and terminating the pregnancy, as long as there is a fetal heartbeat.

24.   MHP did not inform Plaintiff that if she desired to terminate her pregnancy she would have to go to another hospital.

25.   Instead, MHP gave Plaintiff medication to reduce her pain and sent her home.

26.   MHP told Plaintiff to return on December 9, over a week later, for her regularly scheduled doctor's appointment.

27.   This misled Plaintiff to believe there was a significant chance that the fetus would become viable and she would deliver a healthy baby.

28.   MHP also told Plaintiff to return if she began having contractions three to four minutes apart.

5

29.   MHP did not give Plaintiff any other options for treatment.

30.   Upon questioning from Plaintiff, MHP informed her there was nothing else that could be done because Plaintiff was so early in her pregnancy.

31.   After Plaintiff was sent home she remained in pain and generally unable to eat or sleep.

32.   On December 2, 2010, Plaintiff returned to MHP at approximately 7:26 a.m. with pain and bleeding.

33.   When Plaintiff arrived at MHP, she had a temperature of 100.4 and a pain level of 10 on a 10-point scale.

34.   Again, MHP did not inform Plaintiff of the extremely low likelihood that the fetus would survive given her condition.

35.   Again, MHP did not inform Plaintiff of the risks of injury or death that she faced if she attempted to continue her pregnancy.

36.   Again, MHP did not explain to Plaintiff the option of ending the pregnancy.

37.   Had Plaintiff known the extremely low chance of fetal survival and the risk to her health from continuing the pregnancy, she would have terminated the pregnancy.

38.   After Plaintiff's temperature went down, MHP sent Plaintiff home again.  At the time MHP sent Plaintiff home, Plaintiff's treating physician suspected she had chorioamnionitis, a significant bacterial infection that can cause serious damage to a woman's health, including infertility and even death.  However, MHP did not inform Plaintiff of this possible infection.

39.   Before the discharge, MHP told Plaintiff that if her temperature went back up, she should return to the hospital because she may have an infection.

40.   MHP also told Plaintiff that she should return to MHP if her contractions became unbearable.

41.   Plaintiff returned to MHP on the night of December 2, 2010.  Plaintiff was contracting regularly and she was in extreme pain.

42.   Again MHP did not inform Plaintiff of the very low chance that the fetus would survive, the risks to her health of continuing her pregnancy, or the medically appropriate treatment option of terminating her pregnancy.  Rather, MHP prepared to discharge her again.

43.   While Plaintiff was waiting to be discharged, she began to deliver and the feet exited her cervix.

44.   Plaintiff gave birth at approximately 12:13 a.m. on December 3, 2010.

45.   Because Plaintiff was only 18 weeks pregnant, the baby died after only about 2.5 hours.

46.   The birth was a breech delivery and extremely painful for Plaintiff.

47.   The placental pathology report indicates Plaintiff had acute chorioamnionitis and acute funistis at the time she gave birth.

48.   Acute chorioamnionitis and acute funisitis are infections that Plaintiff developed after her membranes ruptured.

49.   Chorioamnionitis or funisitis when untreated can result in infertility and have other permanent deleterious health effects for a pregnant woman.

50.   As Plaintiff was being discharged, MHP required her to arrange for burial or cremation of the baby.  This unexpected information emotionally devastated and traumatized Plaintiff.

51.   Plaintiff made arrangements with a funeral home and then went home.

52.   The standard of medical care required MHP to:

    a.  inform Plaintiff about her treatment options prior to discharge on December 1 and December 2, 2010, including termination of her pregnancy;

    b.  inform Plaintiff about the health risks associated with continuing her pregnancy after her water broke;

    c.  inform Plaintiff that even if she continued her pregnancy despite the associated health risks, there was virtually no chance that the fetus she was carrying would survive; and

    d.  provide appropriate medical care to Plaintiff.

53.   MHP did not do any of the acts listed in the above paragraph because it was a Catholic hospital that adheres to Defendant USCCB's Directives.

54.   In late 2012 or early 2013, a public health educator in Muskegon working on a federally funded public health surveillance project on infant and fetal mortality discovered that MHP had not induced labor in at least five instances where the pregnant woman miscarried before the fetus was viable and was diagnosed with preterm premature rupture of membrane.

55.   In 2013, the public health educator brought these five cases to the attention of MHP during a meeting with the Vice President of Mission Services of MHP, Joseph O'Meara.

56.   Plaintiff's trauma at MHP in December 2010 was one of the cases discovered by the public health educator and discussed with Mr. O'Meara.

57.   Mr. O'Meara explained to the public health educator that upon review of Plaintiff's chart by a MHP physician, MHP's decision not to induce labor was proper because Defendant USCCB's Directives prohibited MHP from inducing labor in that situation.

58.    As a direct and proximate result of the negligent acts and omissions described in this complaint, Plaintiff:

    a.   Was forced to endure severe pain;

    b.   Suffered a great deal of mental pain and anguish and was extremely upset, and will continue to suffer from the emotional injuries sustained for an undetermined length of time;

    c.   Was forced to undergo a riskier and more painful breech delivery;

    d.   Suffered shock and emotional trauma associated with making funeral arrangements for her dead child;

    e.   Has been required to endure many other discomforts and pain associated with the foregoing.

**The Role of Defendant USCCB**

59.    Defendant USCCB is a not-for-profit corporation.  Its membership includes all bishops in the United States and the U.S. Virgin Islands.

60.    On November 17, 2009, USCCB published the Fifth Edition of the Ethical and Religious Directives for Catholic Health Care Services ("Directives").

61.    The Directives directed the course of care Plaintiff received.

62.    Directive 5 states: "Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel."

63.    Directive 5 required MHP to adhere to all of the Directives.

9

64. Directive 9 states: "Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good."

65. Directive 27 states: "Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; it risks, side-effects, consequences and costs; and any reasonable and morally legitimate alternatives, including no treatment at all."

66. Directive 27 does not require MHP to provide a patient with information not deemed "morally legitimate," such as a pre-viability pregnancy termination, even when such information is necessary to safeguard the patient's health.

67. Directive 45 states: "Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers."

68. By their terms, the Directives do not allow a pregnancy termination procedure to be performed in situations when the pregnancy itself places the pregnant woman at risk of harm.

69. Directive 45's prohibition of "material cooperation" with respect to the provision of pregnancy termination services directs Catholic health care services to refrain from informing

patients about the availability of and/or need for pregnancy termination procedures if the fetus is not viable.

70.     Directive 45 does not allow providers at Catholic health care services to inform patients about the availability of and/or need for pregnancy termination procedures if the fetus is not viable when the pregnancy itself places the pregnant woman at risk of harm.

71.     USCCB intended for Catholic hospitals such as MHP to adhere to the Directives, and it was foreseeable to USCCB that Catholic health care services such as MHP would adhere to the Directives as a whole and each individual Directive listed above.

72.     USCCB is not a "licensed health facility or agency," "licensed health care professional," or an "employee or agent of a licensed health facility or agency" under M.C.L. §§ 600.5838a and 333.20106.

**The Role of Defendants Urban, Ladenburger and Mollison**

73.     Defendant Stanley Urban is the current Chair and Defendants Robert Ladenburger and Mary Mollison are former Chairs of Catholic Health Ministries ("CHM"), an unincorporated foreign entity that required MHP to adhere to the Directives.

74.     The decision that MHP would adhere to Defendant USCCB's Directives was made by CHM in the Eastern District of Michigan.

75.     CHM is not an incorporated entity under the laws of any state in the United States or any foreign country.

76.     As Chairs of the unincorporated entity CHM, Defendants Urban, Ladenburger and Mollison are personally and/or vicariously liable for the acts and omissions of CHM.

77.     In 2000, CHM was established as a public juridic person by an agency within the Vatican under "canon law," a recognized foreign legal system.

11

78.     Under canon law, public juridic persons are "subjects in canon law of obligations and rights which correspond to their nature" and stand trial through their legitimate representatives.

79.     As the current Chair of the public juridic person CHM, Defendant Stanley Urban is the legitimate representative of CHM.

80.     As Chair of the public juridic person CHM in 2010, Defendant Robert Ladenburger was a legitimate representative of CHM in 2010.

81.     As Chair of the public juridic person CHM in 2009, Defendant Mary Mollison was a legitimate representative of CHM in 2009.

82.     In 2000, CHM became the official Catholic sponsor of a newly established healthcare system, Trinity Health, which operates multiple hospitals.

83.     As Trinity Health's Catholic sponsor, CHM oversees Trinity Health's Catholic Identity.

84.     Public juridic persons such as CHM operate in accordance with their canonical statutes and bylaws.

85.     On May 4, 2009, CHM approved amended Canonical Statutes and Canonical Bylaws.

86.     CHM's amended Canonical Bylaws state that CHM "will adhere to the Ethical and Religious Directives for Catholic Health Care Services promulgated by the United States Conference of Catholic Bishops."

87.     CHM's decision to adhere to USCCB's Directives meant that all hospitals within Trinity Health's healthcare system would be required to adhere to the Directives.

88.   In April 2008, Trinity Health took over the operation of the newly-merged Mercy Health Partners ("MHP") hospital in Muskegon, Michigan.

89.   During the 2008 merger process, Roger Spoelman, then-President of one of the hospitals that would become MHP, stated publicly that MHP would be held responsible by Trinity Health to conduct business consistent with Defendant USCCB's Directives.

90.   Trinity Health filed a Restated and Amended Articles of Incorporation on December 28, 2009.

91.   Trinity Health's 2009 Amended Articles of Incorporation lists several powers that are reserved exclusively for CHM.  Among those powers is the power "[t]o adopt and approve the Mission and Core Values of the Corporation, the Founding Principles of CHM and Trinity Health and any changes thereto, and approve matters that affect the Catholic Identity of the Corporation."

92.   Article III of Trinity Health's 2009 Amended Articles of Incorporation is entitled "Catholic Identity."  That section states in full:

> The activities of the Corporation shall be carried out in a manner consistent with "The Founding Principles of Catholic Health Ministries and Trinity Health" or a successor document which sets forth the principles describing how the Apostolic and Charitable Works of Catholic Health Ministries are to be carried out; the teachings of the Roman Catholic Church; other directives promulgated from time to time by Catholic Health Ministries and the values and principles inherent in the medical-moral teachings of the Church (such as the Ethical and Religious Directives for Catholic Health Care Services) as promulgated from time to time by the United States Conference of Catholic Bishops (or any successor organization) and as interpreted by the local Ordinary, and as amended from time to time.

93.   Article VI of Trinity Health's 2009 Amended Articles of Incorporation, entitled "Directors," states: "Directors of the Corporation shall be those individuals who serve as Members of Catholic Health Ministries ('CHM'), the religious sponsor of the Corporation."

Likewise, CHM's amended Canonical Statutes state that the members of CHM will be the "same physical persons" as the Directors of Trinity Health.

94.   CHM is not a "licensed health facility or agency," "licensed health care professional," or an "employee or agent of a licensed health facility or agency" as those terms are defined under M.C.L. §§600.5838a and 333.20106.

95.   At all times relevant to this lawsuit:

   a.   CHM had the authority to determine whether Trinity Health and its affiliated hospitals, including MHP, would comply with USCCB's Directives;

   b.   MHP was required to adhere to decisions made by CHM on Catholic Identity-related matters;

   c.   CHM's decision to adhere to USCCB's Directives applied to MHP; and

   d.   CHM required Trinity Health and MHP to follow USCCB's Directives.


## COUNT ONE

### NEGLIGENCE AGAINT DEFENDANT USCCB

96.   The allegations contained in the preceding paragraphs are adopted by reference.

97.   At all times relevant to this lawsuit, Defendant USCCB's Directives stated Catholic health care services must adopt its Directives as policy.

98.   At all times relevant to this lawsuit, it was foreseeable to USCCB that Catholic health care services would adopt its Directives, in whole or in part, as policy.

99.   At all times relevant to this lawsuit, Trinity Health and MHP were Catholic health care services.

14

100. At all times relevant to this lawsuit, USCCB, by promulgating the Directives, undertook the task of creating policies for Catholic health care services.

101. At all times relevant to this lawsuit, USCCB, by promulgating the Directives, assumed the duty owed by Trinity Health and/or MHP to create policies in a manner that ensured patients of Trinity Health's affiliated hospitals received medically appropriate care.

102. At all times relevant to this lawsuit it was the duty of Defendant USCCB to act in a reasonably prudent manner when drafting, publishing and/or disseminating the Directives to ensure that compliance with the Directives did not:

   a. Increase the risk of harm to patients of Catholic health care services that implemented the Directives;

   b. Increase the actual harm to patients of Catholic health care services that implemented the Directives;

   c. Prevent or otherwise impede Catholic health care services from complying with state laws and regulations, such as M.C.L. § 333.20201(e), that require all hospitals to provide patients with reasonable care and/or information about their medical condition, proposed course of treatment, and prospects for recovery, in terms that patients can understand;

   d. Prevent or otherwise impede Catholic health care services from complying with federal regulations, such as the Conditions of Participation of Medicare and Medicaid, that require hospitals to give patients the right to participate in the development and implementation of their plan of care and make informed decisions regarding their care, which includes being informed of their health

15

status, being involved in care planning and treatment, and being able to request or refuse treatment;

e. Prevent or otherwise impede Catholic health care services from complying with federal laws, such as the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd(e)(3)(A), that require hospitals to provide patients facing a medical emergency such treatment as necessary to assure that no material deterioration of their condition is likely;

f. Prevent or otherwise impede Catholic health care services from providing Plaintiff with information about the low chance of fetal survival;

g. Prevent or otherwise impede Catholic health care services from providing Plaintiff with information about the risks to her health;

h. Prevent or otherwise impede Catholic health care services from providing Plaintiff with information about her treatment options; and

i. Prevent or otherwise impede Catholic health care services from providing Plaintiff with medically appropriate information.

103. At all times relevant to this lawsuit, Defendant USCCB negligently breached each and every one of the duties contained in the preceding paragraph by prohibiting, through its Directives, Catholic health care services from doing one or more of the following:

a. Providing treatment otherwise prohibited by the Directives;

b. Providing treatment otherwise prohibited by the Directives when necessary to protect a patient's health;

c. Providing information about treatment options that are not considered morally legitimate;

    d.   Performing an otherwise prohibited pregnancy termination, or informing patients about pregnancy termination options, when the pregnant woman's health is at risk if the pregnancy is continued;

    e.   Providing treatment otherwise prohibited by the Directives, or informing patients about the need for treatment prohibited by the Directives, even when the patient's physician, or other treating provider, determines in his or her medical judgment that such treatment is medically necessary to safeguard the health of the patient.

104.  As a direct and proximate result of the negligent acts and omissions of Defendant USCCB, Plaintiff suffered the injuries listed in paragraph 58.

105.  As a result of Defendant USCCB's negligence, Plaintiff has suffered damages in an amount greater than $75,000.

## COUNT TWO

## NEGLIGENCE AGAINST DEFENDANTS URBAN, LADENBURGER AND MOLLISON

106.  The allegations contained in the preceding paragraphs are adopted by reference.

107.  Stanley Urban is the Chair of CHM.

108.  As Chair of CHM, Stanley Urban is personally and/or vicariously liable for the negligent acts and omissions of CHM.

109.  Robert Ladenburger was the Chair of CHM in 2010.

110.  Ladenburger is personally and/or vicariously liable for the negligent acts and omissions of CHM in 2010.

111.  Mary Mollison was the Chair of CHM in 2009.

112. Mollison is personally and/or vicariously liable for the negligent acts and omissions of CHM in 2009.

113. At all times relevant to this lawsuit, CHM required Trinity Health and its affiliated hospitals, including MHP, to adhere to Defendant USCCB's Directives.

114. At all times relevant to this lawsuit, Trinity Health delegated certain powers and responsibilities to CHM.

115. Under this delegated authority, CHM had the responsibility to determine and/or approve the policy of Trinity Health and its affiliated hospitals, including MHP, on matters that affect Trinity Health's Catholic Identity.

116. Under this delegated authority, CHM had the responsibility to determine and/or approve the policy of Trinity Health and its affiliated hospitals, including MHP, with respect to the issue of pregnancy termination.

117. Under this delegated authority, CHM had the responsibility and duty to act in a reasonably prudent manner including, but not limited to, the following:

    a.  Create and/or approve policies that ensured patients of MHP received reasonable care;

    b.  Not create and/or approve policies that increased the risk of harm to patients of MHP;

    c.  Not create and/or approve policies that increased actual harm to patients of MHP;

    d.  Ensure that MHP's compliance with a CHM-created or -approved policy did not prevent or otherwise impede MHP from also complying with state laws and regulations, such as M.C.L. § 333.20201(e), that require hospitals to provide

reasonable care and/or reasonable emergency care and to provide patients with information about their medical condition, proposed course of treatment, and/or prospects for recovery, in terms that the patient can understand;

e. Ensure that MHP's compliance with a CHM-created or -approved policy did not prevent or otherwise impede MHP from complying with federal laws, such as the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd(e)(3)(A), that require hospitals to provide patients facing a medical emergency with such treatment as necessary to assure that no material deterioration of their condition is likely;

f. Ensure that MHP's compliance with a CHM-created or -approved policy did not prevent or otherwise impede MHP from also complying with federal regulations, such as the Conditions of Participation of Medicare and Medicaid, that require hospitals to give patients the right to participate in the development and implementation of their plan of care and make informed decisions regarding their care, which includes being informed of their health status, being involved in care planning and treatment, and being able to request or refuse treatment.

115. At all times relevant to this lawsuit, CHM negligently breached each and every one of the duties contained in the preceding paragraph by requiring MHP to adhere to the Directives, which thereby prohibited MHP from:

a. Providing treatment otherwise prohibited by the Directives;

b. Providing treatment otherwise prohibited by the Directives when necessary to protect a patient's health;

   c.  Providing information about treatment options that are not considered morally legitimate;

   d.  Performing an otherwise prohibited pregnancy termination, or informing patients about pregnancy termination options, when the pregnant woman's health is at risk if the pregnancy is continued;

   e.  Providing treatment otherwise prohibited by the Directives, or informing patients about the need for treatment prohibited by the Directives, even when the patient's physician, or other treating provider, determines in his or her medical judgment that such treatment is medically necessary to safeguard the health of the patient.

118.  As a direct and proximate result of the negligent acts and omissions of CHM, Plaintiff suffered the injuries listed in paragraph 58.

119.  As a result of CHM's negligence, Plaintiff has suffered damages in an amount greater than $75,000.

## DEMAND FOR RELIEF

Plaintiff requests that this Court:

   a.  assert jurisdiction over this matter;

   b.  declare that Defendants' negligent acts and/or omissions caused Plaintiff injury;

   c.  declare that Defendants' negligent acts were willful, wanton, grossly negligent and/or reckless;

   d.  award compensatory damages to Plaintiff, in an amount to be proved at trial;

   e.  award punitive or exemplary damages to Plaintiff, in an amount to be proved at trial;

f.   grant or award such other relief that this Court deems just and proper.

Respectfully submitted,

/s/ Brooke A. Merriweather-Tucker
Brooke A. Merriweather-Tucker
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6823
btucker@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

/s/ Louise Melling
Louise Melling
Jennifer Dalven*
Alexa Kolbi-Molinas*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
lmelling@aclu.org
jdalven@aclu.org
akolbi-molinas@aclu.org

   *Applications for admission forthcoming

/s/ Don Ferris
Don Ferris (P26436)
Heidi Salter-Ferris (P41481)
Cooperating Attorneys, American Civil
Liberties Union Fund of Michigan
Ferris & Salter, P.C.
4158 Washtenaw Ave.
Ann Arbor, MI 48108
(734) 677-2020

Attorneys for Plaintiff

Dated:  November 29, 2013

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

/s/ Brooke A. Merriweather-Tucker
Brooke A. Merriweather-Tucker
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6823
btucker@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

/s/ Louise Melling
Louise Melling
Jennifer Dalven*
Alexa Kolbi-Molinas*
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
lmelling@aclu.org
jdalven@aclu.org
akolbi-molinas@aclu.org

*Applications for admission forthcoming*

/s/ Don Ferris
Don Ferris (P26436)
Heidi Salter-Ferris (P41481)
Cooperating Attorneys, American Civil
   Liberties Union Fund of Michigan
Ferris & Salter, P.C.
4158 Washtenaw Ave.
Ann Arbor, MI 48108
(734) 677-2020

Attorneys for Plaintiff

Dated:  November 29, 2013