# EXHIBIT

# C

### AFFIDAVIT OF LINDA HUNT

NOW COMES Linda Hunt, who takes an oath and under the penalty of perjury states as follows:

1.     I am Associate General Secretary of the United States Conference of Catholic Bishops, Inc., ("USCCB") and have been employed in this position, or in my previous positions as Director or Associate Director of the Office of Human Resources of the USCCB, since 1995.

2.     The United States Conference of Catholic Bishops, Inc. is a non-profit civil corporation organized under the laws of the District of Columbia in 2001.

3.     The USCCB is a successor corporation to the United States Catholic Conference [hereinafter "USCC"] and was created and established by the Roman Catholic Bishops of the United States to act as their national public policy agency.

4.     The USCC did not exercise any authority over individual bishops or dioceses.

5.     The USCC's headquarters and principal place of business were in Washington, D.C.

6.     It had no office and maintained no facilities, employees or agents in the State of Michigan.

7.     In June 2001, the USCC's name was changed to the USCCB.

8.     At the same time the USCC existed as a separate corporate entity, there also existed an entity called the National Conference of Catholic Bishops [hereinafter "NCCB"], which was an unincorporated ecclesiastical association of all Roman Catholic Bishops in the United States and its territories.

9.     Its offices were in Washington, D.C. and it had no offices and maintained no facilities, employees or agents in the State of Michigan.

10.     The NCCB existed for the purpose of fostering the collegial concerns

1

of the Bishops for the Church and society.

11.    The NCCB was exclusively an episcopal assembly of the Church hierarchy, with no authority over individual Bishops or Dioceses.

12.    The NCCB's functions and purposes have now been folded into the USCCB.

13.    Today, the USCCB carries on the episcopal functions and religious goals of the NCCB and USCC.

14.    The USCCB's headquarters and principal place of business are in Washington, D.C.

15.    Under the Roman Catholic Church's Code of Canon Law, the task of the USCCB is circumscribed. Governance of dioceses rests with individual Bishops, and not in the USCCB.

16.    The USCCB is a non-profit, charitable organization whose members are the active Bishops, Archbishops and Cardinals of the United States.  It advocates and promotes the pastoral teachings of the Roman Catholic Church in such diverse areas as liturgy, doctrine, education, family and life, health care, social welfare, immigration, civil rights, criminal justice and the economy.

17.    The USCCB also acts as a service or professional organization, providing assistance to the Bishops in their pastoral work.

18.    The USCCB provides support and assistance to diocesan and other service organizations throughout the United States through its offices in Washington, D.C. and some of its staff make occasional assistance visits to, or participate in meetings, in dioceses across the country, including Michigan.

19.    USCCB maintains a publishing arm that primarily conducts its activities in the District of Columbia. It effects all of its sales in the District of Columbia and distributes publications from Maryland by mail to customers primarily in the United States, including Michigan, and elsewhere.

2

20.    All Archbishops, Bishops and Cardinals of the Roman Catholic Church in the United States belong, *ex officio,* to the USCCB.

21.    While certain Archbishops and Bishops may be elected as officers of the USCCB, or have other official responsibilities in regard to it, unless a Bishop is acting in such a capacity for the USCCB, his decisions and actions are independent from the USCCB and are not the actions of the USCCB.

22.    While a Diocesan Bishop may have official responsibilities in the USCCB, it is never the case that in fulfilling his responsibilities as a USCCB official that his decisions relate in any way to the administration of his diocese.

23.    A Bishop's actions or inactions in the conduct and administration of his own diocese, or as related to the conduct of entities that are part of that diocese, are his alone, and are not subject to the control of the USCCB.

24.    But for the sporadic occasions on which a Bishop may be acting in pursuance of his official responsibilities in the USCCB, his actions and decisions are not binding on the USCCB and are not the actions of the USCCB.

25.    The USCCB does not direct, control, oversee or supervise Bishops' activities on matters concerning the administration of their diocese, or of the entities that are part of the diocese, or of Catholic organizations operating within that diocese, in Michigan or elsewhere.

26.    As a result of the ecclesial structure and polity of the Roman Catholic Church, which has its basis in the Code of Canon Law, any actions taken or decisions made by any of the Bishops or Dioceses in Michigan are and were made independently of the USCCB.

27.    Hence, there is no Diocese in Michigan that was at any time relevant to this case subject to the actual or potential control of the USCCB.

28.    I am not aware of any dealings of any sort by the USCCB with the Plaintiff or the unnamed medical personnel who are accused of malpractice in this

3

matter.

29. The USCCB has no official relationship to, or authority to control, supervise or direct, the entity plaintiff describes as "Catholic Health Ministries" in the Complaint, or any hospitals it or they are associated with, either in Michigan or elsewhere.

30. Neither the USCCB nor its predecessor entities are or were registered to do business in Michigan. Neither the USCCB nor its predecessor entities maintain or maintained an agent for service of process in Michigan.

31. The USCCB has not applied for, or obtained, permission to conduct business in Michigan. Neither did either of its predecessor entities.

32. Neither the USCCB nor its predecessors, maintains or maintained any offices, employees, agents, bank accounts, mailboxes, or telephone listings in Michigan at any relevant time.

33. The USCCB does not and did not maintain, nor does it or did it have, any interest in real or personal property in Michigan at any relevant time. Neither did any of its predecessor entities.

34. The USCCB authors a publication, "Ethical and Religious Directives for Catholic Health Care Services," Fifth Edition, ("ERDs") which was published in its current form in December 2009. Exhibit A.

35. Its purpose, as set forth in its Preamble, is "twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today." Exhibit A, pp 3-4.

36. These directives "express the Church's moral teaching." *Id.* p 4.

37. They "do not cover in detail all of the complex issues that confront Catholic health care today." *Id.*

4

38.    The ERDs do not preclude anyone from being given appropriate medical care within the applicable standard of care, and they specifically require "free and informed consent . . . for medical treatments and procedures." *Id.* p 20 (no. 26).

39.    The ERDs provide that "Free and informed consent requires that the person . . . receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and costs; and any reasonable and morally legitimate alternatives, including no treatment at all." *Id.* p 20 (no. 27).

40.    Although abortions ("the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus", *Id.* p. 23, No. 45) are contrary to the Ethical and Religious Directives, there is no directive that requires or allows a pregnant woman to be harmed in any way. The ERDs state: "[o]perations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child." *Id.* p 26 (no. 47).

41.    The ERDs are a statement of the Roman Catholic Church's moral and religious positions as it relates to health care issues.

42.    They were not written in the State of Michigan, but instead in Washington, D.C.

43.    The USCCB has no mechanism to enforce the ERDs.

44.    The USCCB does not credential doctors, hospitals, or other health care providers.

45.    The content of this Affidavit represents my testimony based on my own personal knowledge of these matters, or information made available to me in the ordinary course of business and relied upon by me in pursuance of my official

5

duties.

46.    If called to testify at a hearing or at a trial in this matter, my testimony would reflect the content of this Affidavit.

Further Affiant sayeth not.

_____
Linda Hunt
Associate General Secretary
U.S. Conference of Catholic Bishops

6

# EXHIBIT

# A

# TO

# AFFIDAVIT

# OF

# LINDA HUNT

# Ethical and Religious Directives for Catholic Health Care Services

## *Fifth Edition*

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

*Msgr. David J. Malloy, STD*
*General Secretary, USCCB*

Excerpts from *The Documents of Vatican II*, ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible*, copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

ISBN 978-1-60137-101-0

First printing, December 2009

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

# Contents

1   Preamble

3   General Introduction

7   PART ONE
The Social Responsibility of
Catholic Health Care Services

11   PART TWO
The Pastoral and Spiritual Responsibility
of Catholic Health Care

15   PART THREE
The Professional-Patient Relationship

20   PART FOUR
Issues in Care for the Beginning of Life

25   PART FIVE
Issues in Care for the Seriously Ill
and Dying

29   PART SIX
Forming New Partnerships with
Health Care Organizations and Providers

33   Conclusion

38   Index

# Preamble

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious Directives* then is twofold: first,

1

to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is in prescriptive form; the directives promote and protect the truths of the Catholic faith as those truths are brought to bear on concrete issues in health care.

2

# General Introduction

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are

3

the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

4

5

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

# PART ONE
# The Social Responsibility of Catholic Health Care Services

## Introduction

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

Fourth, Catholic health care ministry exercises responsible stewardship of available health care

6

7

resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

## Directives

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

8

9

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

10

# PART TWO
# The Pastoral and Spiritual Responsibility of Catholic Health Care

## Introduction

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological

11

advances in medicine have reduced the length of hospital stays dramatically. It follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

## Directives

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

14

# PART THREE
# The Professional-Patient Relationship

## Introduction

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

15

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

## Directives

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given

16

17

free and informed consent. In instances of non-therapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

18

19

# PART FOUR
# Issues in Care for the Beginning of Life

## Introduction

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole person. . . . The actions within marriage by which the couple are united intimately and chastely are noble and worthy ones. Expressed in a manner which is truly human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

> The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and inviolable laws which must be recognized and observed. For this reason, one cannot use means and follow methods which could be licit in the transmission of the life of plants and animals.[25]

Because the moral law is rooted in the whole of human nature, human persons, through intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the Creator.[26]

## Directives

38. When the marital act of sexual intercourse is not able to attain its procreative purpose, assistance that does not separate the unitive and procreative ends of the act, and does not substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative meanings of sexual intercourse and do not involve the destruction of human embryos, or their deliberate generation in such numbers that it is clearly envisaged that all cannot implant and some are simply being used to maximize the chances of others implanting, may be used as therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the use of gametes coming from at least one donor other than the spouses) is prohibited because it is contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception using the gametes of the two spouses joined in marriage) is prohibited when it separates procreation from the marital act in its unitive significance (e.g., any technique used to achieve extracorporeal conception).[29]

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

24

# PART FIVE
# Issues in Care for the
# Seriously Ill and Dying

## Introduction

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for formulating a true moral judgment about the use of technology to maintain life. The use

25

of life-sustaining technology is judged in light of the Christian meaning of life, suffering, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

## Directives

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that will make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the

judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57. A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58. In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59. The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

60. Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who

26

27

request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

28

# PART SIX
# Forming New Partnerships with Health Care Organizations and Providers

## Introduction

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a responsible stewardship of limited health care

29

resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misin-

terpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

## Directives

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

## Conclusion

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

# Notes

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).
2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.
3. *Health and Health Care*, p. 5.
4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity (Apostolicam Actuositatem)* (1965), no. 1.
5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World (Christifideles Laici)* (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.
6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day (Donum Vitae)* (Washington, DC: United States Conference of Catholic Bishops, 1987).
7. Pope John XXIII, Encyclical Letter *Peace on Earth (Pacem in Terris)* (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care*, pp. 5, 17-18; *Catechism of the Catholic Church*, 2nd ed. (Washington, DC: Libreria Editrice Vaticana–United States Conference of Catholic Bishops, 2000), no. 2211.
8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio" (Sollicitudo Rei Socialis)* (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.
9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.
10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.
11. *Health and Health Care*, p. 12.
12. Cf. *Code of Canon Law*, cc. 921-923.
13. Cf. ibid., c. 867, § 2, and c. 871.
14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."
15. Cf. c. 883, 3º.
16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.
17. Cf. directive 53.
18. *Declaration on Euthanasia*, Part IV; cf. also directives 56-57.
19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.
20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.
21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World (Gaudium et Spes)* (1965), no. 49.
22. Ibid., no. 50.
23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth (Humanae Vitae)* (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.
24. Ibid., no. 12.

25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae*, no. 4.

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth (Veritatis Splendor)* (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae*, Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae*, Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae*, Part I, no. 2.

33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering (Salvifici Doloris)* (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.

36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. See *Declaration on Euthanasia*.

38. Ibid., Part II.

39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life (Evangelium Vitae)* (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.

40. See Pope John Paul II, Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).

41. Congregation for the Doctrine of the Faith, Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

42. See *Declaration on Euthanasia*, Part IV.

43. *Donum Vitae*, Part I, no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas, Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumque Sterilizatio*), March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, *a fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

# Index

Abortion  23, 28, 31, 34, 37
Abuse, physical  18
Advance medical directive  16
Artificial insemination,  36
    assistance to marital act  21, 22
    by donor  22
    by husband  22, 36

Bishop, role of  4-5, 14, 19, 31-32

Common good  6, 7, 9-10
Confidentiality  15, 18
Consent  17, 18, 24, 28
Contraception  21, 24, 37
Cooperation, principles governing  23, 30-31, 35, 37

Death,
    Christian meaning of  3-4, 25-26
    danger of  11, 13-14, 20, 23, 25-26
    determination of  28
Dignity, respect for human  2, 5, 7, 10, 11, 16, 20-21, 22, 25, 26, 28
Embryo(s),
    destruction of human  22
    experimentation on human  24
    multiplication of human  22
Employment  9-10
Ethics committees  19
Euthanasia  25, 26, 27, 28, 31, 37
Experimentation,  17-18
    on living human embryos and fetuses  24
    on noncompetents  18
    therapeutic and nontherapeutic  17-18, 24
Extrauterine pregnancy  23

Genetic counseling  24

Identity, Catholic  1, 5, 16, 30-31
Infertility  21, 22, 23
Integrity,
    biological  35
    bodily  17
    functional  17, 35
    physical  24
    principle of  17

Labor, induced  23
Laity, role of  1, 4, 12-13

Magisterium  5, 8, 26
Marriage, Christian vision of  20-21
Masturbation  36

Natural family planning  21, 24
Non-Catholics,
    administration of sacraments to  14
    appointment of  4-5, 14
    provision of pastoral care to  12
Nutrition and hydration, medically assisted  26, 27, 37

Organ donation  17, 28

Pain management  25, 28
Partnerships  29-31, 35, 37
Pastoral care,  11-14
    director of  13-14
Poor, care for the  7, 8, 22, 30, 33
Prenatal diagnosis  24
Priests,
    appointment of  14
    role of  12, 13, 14
Proportionate/disproportionate means  17, 18, 23, 24, 26-27

Rape  18, 35
Religious, role of  1, 4, 12, 13
Reproductive technology  20-23
Research, medical  2, 9, 24, 28
Responsible parenthood  21, 24
Right(s),  7-9
    of conscience  8
    of married couples  24
    to health care  8-9
    to life  8-9
    to make an advance directive  16
    to organize and bargain collectively  9
    to prepare for death  28
    to preserve bodily and functional integrity  17

Sacraments,
    administration of  11-14
    Anointing of the Sick  13-14
    Baptism  4, 13, 35

Confirmation  13
Eucharist (and Viaticum)  12-14
Penance  12-14
record of  13
to non-Catholics  14
Scandal  23, 30, 31, 32, 37
Sponsors  2, 4, 9, 29, 30, 31
Sterilization  24, 31, 37
Stewardship  5, 7, 8-9, 25, 29, 35
Suffering, Christian meaning of  3-4, 25-26, 28
Suicide,  25, 27
physician-assisted  31, 37
Surrogacy,
in decision making  16-18
in motherhood  22

Tissue, use of human  28

Withdrawal of life-sustaining procedures  26-28

40

This revised edition reaffirms the ethical standards of behavior in health care from the Church's teaching about the dignity of the human person, and it provides guidance and direction on moral issues that Catholic health care providers face today.

Also available in 3-hole format, No. 7-102, and e-book format, No. 7-103.

## OTHER RELATED TITLES

**Dignity of the Human Person**
No. 7-069, 76 pp.

**On Embryonic Stem Cell Research**
No. 7-044, 8-panel brochure, package of 25

**Health and Health Care**
No. 830-4, 20 pp.

**Declaration on Euthanasia**
No. 704-9, 12 pp.

**Nutrition and Hydration: Moral and Pastoral Reflections**
No. 516-X, 16 pp.

To order these resources or to obtain a catalog of other USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español o catálogos, visite el sitio Web *www.usccbpublishing.org* o llame al número gratuito 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.

PUBLICATION NO. 7-101
USCCB PUBLISHING
WASHINGTON, D.C.
ISBN: 978-1-60137-101-0



USCCB
PUBLISHING

usccbpublishing.org



ISBN 978-1-60137-101-0