# Exhibit D

Health Progress
July-August, 2001    Volume 82, Number 4

# Toward Juridic Personality
*The Evolution of Health Care Sponsorship Continues to Be Dynamic*

**BY REV. FRANCIS MORRISEY, OMI, JCD, PhD**
*Fr. Francis Morrisey, OMI, JCD, PhD in on the faculty of canon law, Saint Paul University, Ottawa.*

*Sponsor* is a term derived from the Latin word for "guarantor." By tradition, it refers to a person who presents another person for baptism or confirmation, taking responsibility for the latter's religious education and spiritual welfare.

In institutional history, sponsorship denotes a relationship between two organizations: one, the sponsor, lends its name to, and exercises governance over, another. In the past, the concepts of sponsorship and ownership were intertwined. Catholic congregations, for example, were understood to own fully the health care institutions they sponsored. Today, however, many congregations sponsor such institutions without having any direct ownership rights over them.

Sponsorship in the Catholic sense has little meaning unless it is related to the mission and ministry of the church. The church's mission is threefold: to teach, to sanctify, and to serve through governance. Health care is one of the elements of service. Sponsors of health care organizations must be able to articulate what they consider to be the "non-negotiables" of the ministry, yet, at the same time, be flexible enough in their application to exert a continuing influence over the sponsored organizations. The process requires sponsors to collaborate with others to effect a smooth transition to new forms of health care delivery. Because this evolution is proceeding so rapidly, forms that seemed appropriate only two or three years ago may already be considered obsolete in some quarters.

## Evolution of Sponsorship
We can trace a number of common stages in the recent evolution of sponsorship roles, although not all sponsors went through all the steps or did so in the same order.

**The Early Model** In the past the most common form of sponsorship derived from direct *dominium*, a Latin term implying a limited right of control. According to Catholic theology and canonical practice, temporal goods are not "owned" by individuals but, rather, are entrusted to their care for a specific mission. The early model usually involved the active presence of people identified with the sponsor (women religious, for example) in the daily operations of the institution sponsored (a hospital, for example). In addition, the name of the sponsoring congregation was often found in the name of the sponsored institution.

**Lay Advisory Boards** Following the Second Vatican Council, the Catholic Church, moving away from an almost exclusive reliance on the religious vocations, began to emphasize the dignity of the baptismal vocation. At the same time, the number of men and women religious began to dwindle. As a result, lay people increasingly became involved in the leadership and decision-making processes in Catholic health care. In the beginning of this stage, however, lay involvement was largely confined to advisory boards.

**Lay-Religious Governing Boards** Over time, sponsorship became more identified with the policy setting of the congregation's board of directors than with the actual delivery of health care services. The health care organizations began to acquire "civil recognition"—in the United States, incorporation under the civil law—distinct from that of their sponsoring congregations. This led to the creation of boards for the health care organizations, the memberships of which sometimes coincided with the memberships of the sponsoring congregations.

Later a two-tiered structure developed. Sponsors began to distinguish between a congregation's members and its board of directors. Members were said to possess "reserved powers." Now the Code of Canon Law says little about these powers. When religious congregations first began to consider reserved powers as an acceptable way to sort out authority, some congregations counted as many as 14 of them to be essential. Congregations tended to set the number high because they did not want to relinquish control of their health care organizations. A well-known work by Cardinal Adam Maida and Nicholas Cafardi addressed the issue in detail in 1984.[1] The original reserved powers included (in addition to those still in force today) approval of operating budgets, ratification of appointments of various officers (including but not limited to the health care organization's board members and CEO), and approval of the auditor.

In time, as sponsors became more comfortable with the idea of sharing power, they reduced their lists of reserved powers to essential ones, which were focused in three areas:

- Documents (corporate documents and bylaws)
- Persons (the CEO and board members)
- Property (alienation of land and buildings; mortgages; bond issues)

Then, to facilitate coordination and reduce expenses, congregations began to form what had been separate health care institutions into "systems." This resulted in a further refinement of reserved powers, some of which were now located at the system level, rather than in the congregation's general membership.

**Cosponsorship** In recent years a number of congregations have come together to sponsor health care systems jointly. When this was first tried, a system's cosponsors would attempt to exercise its reserved powers over those organizations for which they had formerly been the sole sponsors. However, this became impossibly complicated as, over time, funds and operations became increasingly mingled.

As a result, cosponsors soon began to delegate most of these powers on a permanent basis to a new board representing all the congregations involved. The only reserved powers not delegated were those relating to property ownership issues or similar matters reserved to the original sponsors.

Canonists are today refining their thinking about canon law requirements concerning property ownership, on one hand, and what is known as "stable patrimony," on the other. Although buildings were once almost automatically considered stable patrimony, today they can become liabilities because they drain resources or at least cannot be used to their full potential. In addition, recent investigations have revealed that many funds once identified with Catholic hospitals were not in fact congregational funds, but were *trusts* administered by the congregations. This has led to a number of important canonical distinctions, particularly regarding inventories (see canon 1283). The recurring question is: Were the goods given to the hospital or to the sponsoring congregation?

One of the advantages of cosponsorship is that it makes the mission and Catholic character of the work sponsored more important than the particular charism of the original sponsoring congregation. And, indeed, discerning the component elements of a particular charism sometimes is difficult. Today congregations are coming together as one to further the healing mission of Christ.*

* Not all forms of cosponsorship have been successful, however. In May the leaders of seven California hospitals belonging to jointly sponsored Catholic Healthcare West, based in San Francisco, asked to be released from that system in order to form a systSm of their own under the aegis of the Daughters of Charity, their former sponsor.

**Toward Lay-Religious Sponsorship** It has long been common for a congregation and diocese to come together to jointly operate certain institutions—nursing homes, for example. In such cases, establishing new diocesan church corporations known as "juridic persons" to assume canonical sponsorship of the institution was appropriate.

By the same token, because cosponsored health care systems often overlapped diocesan boundaries, it sometimes became appropriate to ask a higher authority to grant distinct canonical recognition to such systems, making them, in effect, self-sponsored. A recent example is the granting by the Holy See of new types of recognition—either "public juridic personality" or "private juridic personality," depending on the situation.†

† There are other models, but it is not necessary to address them here.

**Juridic Persons**
The Catholic Church recognizes three different kinds of "person":

- *Physical persons,* people who have received baptism, constitute the church. In the secular world, they would be called *citizens.*
- *Moral persons* are institutions that have come into existence through the aid of no legislator. The Code of Canon Law, which employs the concept only in passing, describes both the Apostolic See and the Catholic Church itself as moral persons. These resemble what secular society calls the *nation* and the *family,* neither of which has specific legal recognition (although many people speak readily nowadays of "family values").
- *Juridic persons,* unlike moral persons, *are* creations of the law; they enable people to come together to perform a work or carry out a mission they would be unable to do on their own.

> Although juridic persons are represented by individuals (board members, for example), they have perpetual existence. The entity that most resembles them in our secular society is the *corporation*.

Religious congregations and dioceses, among other entities, are juridic persons by virtue of the canon law itself. Other juridic persons are established by a decree of the Holy See or a diocesan bishop and governed by statutes that are approved at the time juridic personality is conferred.

Although juridic persons have been recognized in church law for centuries, there have been some particularly interesting developments in recent years. The Code of Canon Law, promulgated in 1983, distinguishes between two types of juridic person:

- *Public juridic persons* operate in the name of the church; their temporal goods are ecclesiastical goods; they represent the church in the same sense that a diocese or religious congregation does.
- *Private juridic persons* function in their own name; their goods are not considered ecclesiastical goods; their works are considered more the *work of Catholics* than *Catholic works*.

- Canon law specialists once considered the private juridic person structure to be especially promising because many of the norms relating to the administration and alienation of ecclesiastical temporal goods would not apply to it. However, few private juridic persons have been established in health care. PeaceHealth, based in Bellevue, WA, is probably the best known.

As a sponsorship model, juridic personality brings with it several questions.

**Who Grants Juridic Status?** One practical difficulty concerns the Vatican authority having the competence to grant pontifical approval. If the property were that of a religious congregation, then the Congregation for Institutes of Consecrated Life and Societies of Apostolic Life (CICLSAL) would be competent to grant recognition. In fact, CICLSAL has done so recently. If the property were diocesan, on the other hand, questions involving it would be referred to the Congregation for the Clergy. However, I am not aware of any decisions in this regard having been made to date.[2] It would not be surprising if the Holy See were eventually to create a special department to make such decisions and oversee their results. Interestingly, the Catholic Church, which is one of the world's largest health care providers, has not yet created a department to address this vital dimension of the apostolate.*

---

\* The Vatican does have a Pontifical Council for Healthcare Workers, but it does not deal with health care institutions as such, or with their pontifical status. The Pontifical Council for the Laity might be involved in such questions if the work concerned were entirely sponsored by laity.

The Code of Canon law is also unclear on who is entitled to establish juridic personality. In fact, it never addresses the question directly. Canon 114 says that juridic persons must be established by a "competent authority," but it does not specify the authority. Some canonists, proceeding by way of analogy with the prescriptions of canon 312 on the establishment of associations of the faithful, say the relevant authority is either the Holy See, the conference of bishops, or the diocesan bishop. Discussion continues as to whether the bishops of an ecclesiastical province may establish a public juridic person for their territory.† To my knowledge, no conference of bishops has yet established a public juridic person for health care, although such conferences undoubtedly have authority to do so.

---

† An ecclesiastical province is a group of neighboring dioceses gathered together to promote common pastoral action. The head of an ecclesiastical province is an archbishop; the head of a diocese is a bishop. See canon 431.

By the same token, there is no doubt that the Holy See can grant juridic personality at any time; and there seems to be no question but that a diocesan bishop can do so for his diocese.‡ Could the head of a congregation establish a public juridic person? (Canon 634 does authorize such persons to establish congregational houses and provinces.) I do not believe so, at least not at the present time. But the matter may have to be addressed in the future.

---

‡ For example, the archbishop of Vancouver, British Columbia, created Chara Health Care Society as a public juridic person on October 17, 1994.

**To What Ministries Does Juridic Personality Extend?** In the United States, juridic personality has been granted to Covenant Health Systems, Waltham, MA; Catholic Health Initiatives, Denver; Hope Ministries, Newtown Square, PA; and Catholic Health Ministries, Novi, MI.[3] Some have asked whether juridic personality should be given to an entire health care system or, instead, limited to one or more of the system's constituent parts.§

§ For example, Hope Ministries' bylaws, whose language is both inclusive and open-ended, state: "The public juridic person was formed to . . . carry on and expand the health care ministries conducted by the above-named religious institutes and those religious institutes that find it necessary to transfer such sponsorship."

On one hand, all the component parts of Covenant Health Systems function under the auspices of the same juridic person. On the other hand, according to its statutes, Hope Ministries, the public juridic person independent of Catholic Health East, assumes canonical responsibility only for those member organizations that were unrelated to the system's former congregational sponsors and those for which their former sponsors could no longer take responsibility.[4] Catholic Health East, a civil corporation, comprises a number of public juridic persons, all of equal canonical status, most of which are religious congregations. Hope Ministries is directly related to none of these congregations, but has equal voice with the other sponsors.

From a practical perspective, when a sponsoring congregation wishes to transfer not only sponsorship but also its ownership rights to a public juridic person, the goods remain within the church, which fact makes it easier to obtain the necessary authorizations to proceed.[5]

**Choosing a Form of Sponsorship**
It is not always easy to determine the appropriate time for moving from one form of canonical sponsorship to another.

We should keep in mind the fact that some of the largest Catholic health care systems do not have distinct canonical status, but, rather, operate under the aegis of a sponsoring religious congregation or a society of apostolic life.|| Dual recognition appears to be unnecessary so long as the sponsoring congregations are fully viable and capable of exercising full control of their sponsored works. However, the more congregations or dioceses are involved, the greater the need for some appropriate form of canonical recognition distinct from that of the sponsoring entities. In such cases, only canonical recognition can give the sponsored organization the autonomy it requires.

|| For instance, Ascension Health and Catholic Healthcare West do not currently have distinct canonical status; they derive their Catholic identity from their sponsors' status.

In Australia, Catholic Health Australia (established in 1999) does not have a canonical status distinct from that of its sponsoring congregations and dioceses. The system's members are the leaders and owners of its constituent organizations. Together they constitute a National Stewardship Board, which delegates responsibility for day-to-day management to a National Commission, currently comprising 10 persons.*

* <u>Catholic Health Australia</u> represents more than 680 Catholic health care sponsors, systems, facilities, and related organizations and services. It is the largest nongovernment provider grouping of health and social services in that country.

In Canada, unlike the United States, requests to the Holy See for juridic personality are sometimes made jointly by the sponsoring religious congregations and the bishops of the territories involved. For example, Catholic Health Sponsors of Ontario, a public juridic person, was established in a way that allows the Catholic Health Association of Ontario (which is jointly sponsored by the bishops and the owners of health care institutions) to assume the seat of any congregation wishing to withdraw from sponsorship of the juridic person.[6]

In New Brunswick, a recent joint request for juridic personality from the bishops and sponsoring congregations has received a positive response.[7] In other parts of Canada, such requests have been presented by congregations with the concordant approval of the diocesan bishops concerned.

Nothing would seem to prevent a public juridic person in one diocese from operating in another, as long as the appropriate authorizations were received from the bishops involved. (Canon 595 allows religious congregations of diocesan right to open houses in other dioceses. Those who seek to perpetuate Catholic health care might keep in mind this apparent fact, which is in line with the principle of subsidiarity.

In the same vein, a number of bishops—not all of them necessarily from the same ecclesiastical province—could perhaps jointly establish a public juridic person that would not be identified with a specific diocese. Such a case would not be entirely without precedent because a similar procedure is envisioned by the Code of Canon Law concerning a number of interdiocesan institutions (see cc. 237, sec. 2, and 1423, sec. 1) and joint funds for the support of the clergy and other church ministers (see c. 1274, sec. 4). However, establishing such a juridic person would to some extent limit the jurisdiction of the bishops involved; none would any longer have *sole* authority over the institutions in his diocese.

Because this is so, establishing a juridic person with assets from more than one diocese would, in some instances, require prior permission from the Holy See.

In Alberta, some years ago, the then archbishop of Edmonton, with the consent of the other bishops of that Canadian province (who represent all or part of two ecclesiastical provinces), established a public juridic person for health care, which today operates throughout the province. †

† The civil Alberta Catholic Hospitals Foundation was established March 31, 1976. It was subsequently given public juridic personality under the same name.

We should remember that, no matter what model of sponsorship is chosen, it will, as an apostolic activity, remain under the direction of the diocesan bishop (see c. 394, sec. 1). The manner in which the bishop's responsibility is exercised will vary from diocese to diocese. In particular, the diocesan bishop should be involved in matters relating to chaplaincy services ("care of souls" and the "liturgy"), and to the work itself (see c. 394 and, by analogy, c. 678).

In addition, the diocesan bishop is responsible for applying the *Ethical and Religious Directives* in his diocese. Simply because a policy obtains in *one* diocese in which a juridic person happens to exercise sponsorship, that does not necessarily mean it obtains in *all* dioceses where the juridic person operates. That will depend on the diocesan bishops. As a juridic person assumes sponsorship of more and more works, it will need to develop protocols for dealing with the bishops involved. Those forming juridic persons should certainly keep their bishops informed of their work's progress, of difficulties encountered, and of challenges seen ahead.

### Unresolved Sponsorship Issues

It is unsurprising, given the volatile state of sponsorship today, that a number of issues remain to be clarified.

**Temporal Goods** Establishing more clearly detailed inventories of ecclesiastical goods, carefully distinguishing those that belong to juridic persons from those that have merely been entrusted to their care, will be necessary. Opinions differ concerning the establishment of foundations to support health care initiatives: Does the creation of such a fund amount to an alienation, given that the goods will no longer be available for general purposes? Assuming that care is taken in determining the purposes, creation of the fund would apparently not be an alienation; it would be an action of administration seeking to protect the church's patrimony by means recognized as valid in civil law (see c. 1284, sec. 2).

**Catholicity as Spirit** Even the best civil documents will not necessarily translate into good spirit in institutions. Catholicity as such cannot be legislated; it is lived. It gives a spirit to a system or institution.

**Commitment to Catholic Teachings** A deep commitment to Catholic teachings, even though not all of them are accepted by the general public, will be necessary. If a health care organization's leaders reduce the sponsor's basic philosophy to "getting around" moral and social issues, they may find that the lessons learned by those using the organization's services are not, in fact, the appropriate ones. Of course, avoiding extremes when evaluating moral situations is essential; the core of truth is rarely found in such extremes: *in medio stat virtus.*

### Sponsors Need Help

Sponsors have a great responsibility in today's rapidly changing world. They embody the church's commitment to the healing ministry of Christ. Like the other members of the Pilgrim Church, sponsors are searching for the best ways to make Christ's message heard in a world that is not particularly interested in these words of eternal life. We who are involved in Catholic health care may need to try harder to help new sponsors assume their duties, especially in providing them with the means of remaining informed on church teachings. We should also support their efforts to locate mechanisms that, adapted to the times, enable them to carry out the ministry in the name of the church.

### NOTES

1. Adam Maida and Nicholas Cafardi, *Church Property, Church Finances, and Church-related Corporations,* Catholic Health Association, St. Louis, 1984, pp. 155-163.
2. See, for example, the response of CICLSAL, May 21, 1999, protocol no. R158-1/99: "After careful study of the proposal, [CICLSAL] has concluded that it does not have competency in the matter. . . . The other solution would be to present the petition to the Congregation for Clergy in view of their competency for matters relating to ecclesiastical goods."

3. Covenant Health System's statutes were approved by CICLSAL July 1, 1995, protocol no. 1299/95; Hope Ministries' were approved by CICLSAL July 7, 2000, decree 15051/2000; and Catholic Health Ministries' were approved by CICLSAL July 14, 2000, protocol no. 15052/2000.
4. See CICLSAL July 7, 2000, decree 15051/2000, approving the statutes of Hope Ministries. The bylaws say: "The public juridic person was formed by decree of the Congregation for Institutes of Consecrated Life and Societies of Apostolic Life dated July 7, 2000, to succeed when appropriate, to carry on and expand the health care ministries conducted by the above-named religious institutes and those religious institutes that find it necessary to transfer such sponsorship."
5. See, for example, CICLSAL, letter no. 15050/2000, February 3, 2000: "Since [. . .] has not yet been granted canonical public juridic personality, we prefer to wait before issuing the requested rescript [for alienation] for those works and their respective foundations. When juridic personality has been granted, it will be sufficient to inform us of the fact, making reference to this letter and protocol number. Unless significant information has changed, it would not be necessary to repeat what we have here on file."
6. See CICLSAL, decree T.145-1/97, November 24, 1997.
7. See CICLSAL, decree B.246-1/2000, March 23, 2001, establishing Catholic Health Partners Inc. as a public juridic person, with headquarters in Miramichi, New Brunswick.

---

### Qualities Required For Sponsorship Roles

A congregation should take care in selecting and educating the board members who will eventually become the sponsors of its health care system. The primary duty of such people is to ensure that the institutions they sponsor operate in accordance with the teaching, discipline, and laws of the Catholic Church. They are to do this, however, by taking into account the mission, vision, and values of the system itself.

What criteria should govern the selection of board members? Are business success and reputation in the community more or less important than knowledge of Christian moral principles? How can a balance be effected in the board's composition?

Once they have been appointed, the board members will have to keep abreast of church teaching to apply it to the best of their ability in the exercise of their responsibilities concerning the system's mission, vision, and values. They can, of course, expect help with this from the system and its mission integration staff. Nevertheless, because the board members have ultimate responsibility for the system's welfare, they will probably need to arrange periodic education for themselves in Catholic social teachings. This will be especially important if the board includes people who are not Catholics and do not therefore have first-hand knowledge of church teachings.

Partly for this reason, most groups that have requested public juridic personality have established provision for a "sponsor's council." This group (the names for it sometimes vary), whose members directly represent the congregation or congregations that formerly sponsored the system, either exercises a certain number of reserved powers or at least gives its opinion on the matter at hand before the board as a whole casts its vote. The sponsor's council also often assumes responsibility for monitoring the application of the *Ethical and Religious Directives for Catholic Health Care Services* throughout the system and, when problems with the directives arise, proposing remedies for them.

The sponsor's council seems to be a most effective mechanism, for it serves as a quality-control supervisor concerning the catholicity of the system and its individual institutions.

Of course, selection for membership on a sponsor's council does not in itself ensure that the person chosen has the necessary knowledge of the various church-related issues. But the chances are good that people will be selected precisely because they *are* competent in such issues.

-Rev. Francis Morrisey, OMI, JCD, PhD