# In The Matter Of:

*Tamesha Means v.*
*United States Conference of Catholic Bishops*

---

*Motions Hearing*
*May 22, 2014*

---

*Cheryl E. Daniel*
*Official Federal Court Reporter*
*313.234.5165 Ext. 4808*

Original File meansvUSCCB052215f.txt
**Min-U-Script®**

1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4    TAMESHA MEANS,

5                     Plaintiff,

6         V                        Case No.  13-14916

7    UNITED STATES CONFERENCE OF

8    CATHOLIC BISHOPS,

9    STANLEY URBAN,

10   ROBERT LADENBURGER,

11   MARY MOLLISON,

12             Defendants.

13   - - - - - - - - - - -- - - - -/

14                 MOTIONS HEARING

15       BEFORE THE HONORABLE DENISE PAGE HOOD

16              U.S. DISTRICT JUDGE

17            231 THEODORE LEVIN BUILDING

18                COURTROOM 237

19               DETROIT, MI 48226

20            THURSDAY, MAY 22, 2014

21

22

23

24

25

2

```
 1                    (APPEARANCES CONTINUED)
 2   APPEARANCES:
 3   FOR THE PLAINTIFF:        BROOKE A. MERIWEATHER-TUCKER,
 4                             DANIEL S. KOROBKIN,
 5                             MICHAEL J. STEINBERG,
 6                             AMERICAN CIVIL LIBERTIES UNION
 7                                 OF MICHIGAN
 8                             2966 WOODWARD AVENUE
 9                             DETROIT, MI 48201
10   FOR THE DEFENDANTS
11   URBAN LADENBURGER
12   And MOLLISON:            DENNIS J. LEVASSEUR,
13                            MICHAEL J. SERRA,
14                            BODMAN, PLC
15                            1901 ST. ANTOINE STREET,
16                                SIXTH FLOOR
17                            DETROIT, MI 48226
18   FOR THE DEFENDANT
19   USCCB:                   CAMERON R. GETTO,
20                            ZAUSMER, KAUFMAN
21                            31700 MIDDLEBELT ROAD,
22                                SUITE 150
23                            FARMINGTON HILLS, MI 48334
24
25
```

3

1                          I N D E X                      PAGE

2   MOTIONS HEARING

3   DEFENDANTS' MOTION FOR CHANGE OF VENUE

4       BY MR. LEVASSEUR                                  5

5       RESPONSE BY MS. TUCKER                           13

6       REBUTTAL BY MR. LEVASSEUR                        21

7       REBUTTAL BY MR. GETTO                            24

8       RE-REBUTTAL BY MS. TUCKER                        25

9   DEFENDANT'S MOTION TO DISMISS

10      BY MR. GETTO                                     26

11      REBUTTAL BY MS. TUCKER                           30

12      REBUTTAL BY MR. LEVASSEUR                        40

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                   Thursday, May 22, 2014

2                   Detroit, Michigan

3                   At approximately 2:20 p.m.

4                   THE CLERK:  The court calls case number

5     13-14916, Means versus United States Conference of

6     Catholic Bishops.

7                   THE COURT:  Good afternoon, everyone.  Put

8     your appearances on, please.

9                   MS. TUCKER:  Brooke Tucker on behalf of

10    Tamesha Means, the Plaintiff.

11                  MR. KOROBKIN:  Daniel Korobkin appearing on

12    behalf of the Plaintiff.

13                  MR. STEINBERG:  Michael Steinberg appearing

14    on behalf of the Plaintiff.

15                  MR. LEVASSEUR:  Dennis Levasseur appearing

16    on behalf of the Defendants Urban, Ladenburger and

17    Mollison.

18                  And with me is my associate Michael Serra of

19    the same firm.  And I brought along one of our summer

20    interns.

21                  MR. GETTO:  Good afternoon.  Cameron Getto

22    on behalf of the United States Conference of Catholic

23    Bishops.

24                  THE COURT:  I have two motions.  One is a

25    Motion to Dismiss and one is a Motion for Change of

5

1   Venue.

2             I would like you to go ahead and argue them

3   both, if you like.  I would like to start with the

4   change of venue though.

5             MR. LEVASSEUR:  Thank you, Your Honor.  That

6   is my motion.

7             Once again, Your Honor, good afternoon.  I'm

8   Dennis Levasseur for Defendants Stanley Urban, Robert

9   Ladenburger and Mary Mollison.  I will refer to them as

10  the individual Defendants so we don't have to repeat

11  their names each time I refer to them.

12            This is the individual Defendants' Motion

13  for Change of Venue of this case to the Western District

14  of Michigan.

15            The Plaintiff in this case is a resident of

16  Muskegon County, was a resident of Muskegon County at

17  the time the cause of action allegedly arose.

18            That was in late 2010 when she sought and

19  received medical treatment in connection with what

20  turned out to be a difficult pregnancy.

21            And she sought that treatment at Mercy

22  Health Partners, a hospital in Muskegon.  She supposedly

23  went into premature labor and lost a child.

24            She claims in her Complaint, which is fairly

25  extensive, but points to the fact she not advised by

6

1    Mercy Health Partners of the risk to her if she

2    continued the pregnancy term.

3            Now, we believe this is kind of a

4    thinly-veiled medical malpractice claim, but instead of

5    suing Mercy Health Partners and the treating physicians

6    and other health care professionals, she elected to sue

7    the individual Defendants and the United States

8    Conference of Catholic Bishops claiming that Mercy

9    Health Partners did not follow a reasonable standard of

10   medical treatment or care because it was a Catholic

11   hospital, Mercy Health Partners was a Catholic hospital

12   but adhered to the U.S. Conference of Catholic Bishops'

13   directives which do not permit abortion services.

14           Plaintiff also claims that the Catholic

15   Health Ministries, which is not a party to this case,

16   had a duty to act in a manner so that patients admitted

17   to Mercy Health Partners in Muskegon receive proper

18   care.  And Catholic Health Ministries, or CHM, which

19   again, is not a party, breached its alleged duty by

20   requiring those Mercy Health Care Partners to adhere to

21   the directives.

22           Now, contrary to what Plaintiff tries to

23   suggest in its opposition papers, it has not named

24   Catholic Health Ministries as a party.  And perhaps they

25   did so, did not name them, because CHM is an

7

1  unincorporated association which would have destroyed

2  diversity of citizenship rendering this case ineligible

3  for filing in federal court and this Court particularly.

4           Now, but this motion is under 28 U.S.C.

5  1391, which provides a civil act may be filed in a

6  district in which a substantial part of the events

7  giving rise to the claim occurred.

8           The purpose of the substantiality

9  requirement is to prevent defendants being hauled into

10  court in a district that has little or no relationship

11  to the dispute.

12           And it's Plaintiff's burden of establishing

13  that venue is proper in this District and not conclusory

14  allegations that can't satisfy that burden.

15           Now here, all that the Plaintiff alleges

16  with regard to the individual Defendants with regard to

17  venue is the very conclusory, and frankly, unsupported

18  assertions that venue is proper here because the

19  decision that Mercy Health Care Partners or Mercy Health

20  Partners would adhere to the directives was made by the

21  Catholic Health Ministries in the Eastern District of

22  Michigan.  That is all they say as to the propriety of

23  venue as to, frankly, any party, but specifically the

24  individual Defendants.

25           That is not more than a conclusory assertion

8

1    based on speculation.

2              They indicate in the response brief at page

3    5 that it is upon information and belief that those

4    directives were adopted in the Eastern District of

5    Michigan.

6              But even if that is true, Your Honor, that

7    doesn't satisfy Plaintiff's burden of demonstrating

8    substantiality of actions in this District that gave

9    rise to the what amounts, we believe, to a medical

10   malpractice claim.

11             But however you characterize it, venue is

12   still not proper.

13             First off, Your Honor, venue must be proper

14   with respect to all of the Defendants, not just the

15   individual Defendants.

16             And Plaintiff's Complaint says nothing about

17   venue with regard to the U.S. Conference of Catholic

18   Bishops, also a Defendant, Your Honor.

19             And we know from the Hunt Affidavit

20   submitted by the Bishops that the directives are

21   promulgated in Washington, DC, not in the Eastern

22   District of Michigan.

23             So we believe the motion should be granted

24   for that reason alone; that the venue with regard to the

25   U.S. Conference is not proper.

9

1            Secondly, Your Honor, as to the individual

2    Defendants, according to Plaintiff's Complaint, the

3    Catholic Health Ministries adopted the directives in May

4    of 2009.  But, if you look at the Complaint, it is

5    alleged that Mr. Ladenburger was the chair of CHM, or

6    Catholic Health Ministries, in 2010; and Mr. Urban is

7    currently chair of the Catholic Health Ministries.

8            They're not alleging they have done anything

9    with regard to the directives or couldn't be, frankly,

10   because the directives were, according to the Complaint,

11   adopted in 2009.

12           So venue is clearly not proper with regard

13   to Mr. Ladenburger or Mr. Urban and the venue motion

14   should be granted for that reason as well.

15           Now, there is, I should indicate, the law

16   clearly demonstrates in this District, the Domino's case

17   and the Overland versus Taylor case, that venue has to

18   be proper with regard to all of the defendants.

19           Now thirdly, Your Honor, as to Ms. Mollison,

20   and frankly, the other individual Defendants, venue is

21   not proper in this District because even the nature of

22   the claims in this case is; that is, that the treatment

23   or lack thereof at Mercy Health Partners in Muskegon,

24   that is the genesis of the entire case.  What type of

25   treatment she received, or lack thereof, at a hospital

10

1    in Muskegon.

2           We have, frankly, a plaintiff who is a

3    resident of Muskegon, or who was in 2010.  We have that

4    she was seen by doctors and other medical health

5    professionals in the Western District of Michigan in

6    2010.

7           There is no indication she was ever in the

8    Eastern District of Michigan with regard to any

9    treatment.

10          Any damages that Plaintiff suffered occurred

11   in the Western District of Michigan.

12          Now, Plaintiff's Complaint, as you can see

13   from paragraphs basically 18 to 59, goes on at length

14   about what happened at Mercy Health Care -- Mercy Health

15   Partners; what happened in Muskegon.  It goes on and on

16   that she was seen on this day, she was sent home, she

17   was seen again on that day.

18          The standard of care allegations at

19   paragraph 52 all relate to what the hospital in Muskegon

20   did or did not do.

21          So we believe under the prevailing case law,

22   Your Honor, that venue is not proper here because the

23   substantial parts of the events that gave rise to the

24   cause of action did not occur in the Eastern District of

25   Michigan.

11

1            Now even, Your Honor, if venue were proper,

2    we believe the case should be transferred to the Western

3    District of Michigan for the convenience of the parties

4    and the witnesses.

5            Now, there are a number of factors, of

6    course, that have to be taken into account.  The first

7    one is venue is proper in the district to which the

8    movant wants the case transferred.

9            Well, there is no dispute that the Western

10   District of Michigan is a proper venue for this case.

11   The convenience of the Plaintiff and the doctors and the

12   other health care professionals at Mercy Health Partners

13   in Muskegon are clearly served by transferring.  It is

14   those treaters who allegedly carried out the directives.

15   The treaters who saw the Plaintiff.  The treaters who

16   allegedly didn't follow the standard of care.  For

17   convenience -- and those are all going to be witnesses

18   in this case.

19            So under the case law we've cited, the

20   McCuiston versus Hoffa case at 313 F.Supp 2d 710 holds,

21   and among others, that the convenience of the witnesses

22   is perhaps the most powerful factor.

23            I should end out, Plaintiff's opposition to

24   our motion for change of venue does not identify a

25   single witness in this District.

12

1           You will note that the individual Defendants

2   are all citizens of different states.  That not one

3   witness even they have identified who resides in the

4   Eastern District of Michigan.

5           And again, as I said, Plaintiff resides in

6   the Western District.

7           So it is not a matter of really transferring

8   a case to a forum convenient to Plaintiff, it would,

9   frankly, be more inconvenient for this Plaintiff.

10          And as Judge Quist ruled in the Steelcase

11  matter at 210 F.Supp 2d 920, that where the plaintiff

12  does not reside in the chosen forum or whether none of

13  the operative facts occurred in the district, the court

14  assigns less weight to the plaintiff's choice of forum.

15          Plaintiff has chosen a forum that actually

16  bears no relationship, in our view, to this case.

17          And finally, Your Honor, the source of proof

18  of the medical records, again, the witnesses are all in

19  the Western District of Michigan.  They can't be hauled

20  into this District to testify.  They all live well

21  outside the 100 mile radius.

22          Therefore, we believe that all the factors

23  for transferring venue to the Western District of

24  Michigan are satisfied in this case, Your Honor.  Thank

25  you.

13

1              THE COURT:  All right.  Thank you very much.

2              MS. TUCKER:  Your Honor, the Co-Defendants

3    have also filed papers on this Motion and I'm not sure

4    if they want to address the Court before --

5              THE COURT:  Do you want to argue?

6              MR. GETTO:  I was going to get up and say,

7    Your Honor, I think Mr. Levasseur covered all the issues

8    very thoroughly and very properly and I don't think

9    there is anything I have to add.

10             THE COURT:  Thank you very much.

11             MS. TUCKER:  Then I guess it is my turn.

12             Good afternoon, Your Honor.  May it please

13   the Court, Your Honor, in an attempt to avoid suit in

14   this Court, the Defendants repeatedly attempt to frame

15   our claims as ones for medical malpractice, but that is

16   simply not the case.  In fact, our claims are far

17   different.

18             Our claims are that Defendant USCCB

19   negligently promulgated the directives with the

20   knowledge and intent they would govern care provided to

21   pregnant women in Catholic hospitals including the over

22   15 hospitals in Michigan.

23             And our claims against the individual

24   Defendants, who are, in fact, representatives of

25   Catholic Health Ministries, for the purpose of this

14

1    litigation, that they adopted the directives in this

2    District which ultimately dictated the care that Ms.

3    Means received.  And as a result of the actions of the

4    Defendants, Ms. Means suffered severe emotional

5    distress.  And at a point after she was approximately 18

6    weeks pregnant, her water broke and she went to the

7    hospital -- the only hospital in her county -- on three

8    separate occasions and was denied the necessary

9    treatment and care.

10             And so it was not because she had the

11   misfortunate on these three occasions just to encounter

12   physicians and nurses who did not know what the proper

13   standard of care was, it was because USCCB's policy

14   prevented any doctor, any nurse, any staff member at

15   that hospital from providing the care that Ms. Means

16   needed.  And that is what our claims are about.

17             As Defendants argued the venue statute that

18   we have sued under, which is 28 USC 1391(b)(2), in that

19   Section, it says that a civil action may be brought in a

20   judicial district in which a substantial part of the

21   events or omissions giving rise to the claims occurred.

22             The Sixth Circuit has interpreted this

23   provision as allowing venue in any forum with a

24   substantial connection to the plaintiff's claim.

25             The Sixth Circuit has further iterated that

15

1    it doesn't matter whether or not there are other

2    districts with an even more substantial connection to

3    plaintiff's claim, that it is not going to engage in

4    that kind of inquiry, all that matters is whether the

5    forum that plaintiff has chosen is, in fact, proper.

6              So as previously stated, our claims center

7    on a policy that was drafted by USCCB and then adopted

8    by Catholic Health Ministries, again represented by the

9    individual Defendants.

10             Unquestionably then the district where the

11   decision was made, in fact, to adopt the policy has

12   substantial connection to the claim.

13             There is no other way that the directives

14   drafted in D.C. would ever have been implemented in

15   Muskegon were it not for the actions of CHM in this

16   District.

17             And Your Honor, I know that the entity of

18   CHM may be somewhat confusing so let me just lay that

19   out at this point.

20             Trinity Health, which is headquartered in

21   Livonia, Michigan, in the Eastern District, is the

22   second largest Catholic health care system in the

23   country.  That health care system, of which Mercy Health

24   Care Partners in Muskegon is a part, has delegated

25   certain responsibilities to Catholic Health Ministries,

16

1    and one of those responsibilities deals with the

2    decision whether to adopt certain policies, including

3    the directives.

4              Because it is an unincorporated association

5    under Michigan law, the law that governs in this case,

6    it can be sued for its acts under its own name or in the

7    name of any of its members.  And that is what we have

8    done here.

9              So all of this argument that the decision

10   that was made to adopt the directives was made by a

11   nonparty is just a red herring, because we have, in

12   fact, sued the representatives of CHM and they are

13   represented here today.

14             But even if that were true, even if you

15   consider the individual Defendants to be nonparties,

16   despite the fact it was Ms. Mollison that, in fact,

17   signed the document making the directives binding on

18   Mercy Health Partners, even if that is the case, there

19   is nothing in the case law, nothing in the venue statute

20   that says the substantial acts that are necessary for

21   venue that they have to be committed by a party.

22   Because that provision of the venue statute, it focuses

23   on the claims, and so you look at the entire sequence of

24   events giving rise to the claim to determine whether

25   venue is proper.

17

1              So we look at what has happened in this case

2    and what we are suing on is after the Defendants drafted

3    the directives, somehow MHP had to get the directives,

4    had to be told that it was going to comply with the

5    directives.  Or we would not be here.  Ms. Means would

6    not have been given substandard care.  Ms. Means would

7    not have suffered harm.

8              And that decision, which Defendants have not

9    disputed, was made by Catholic Health Ministries in the

10   Eastern District of Michigan.

11             THE COURT:  And how do you know that?

12             MS. TUCKER:  Well, for two reasons, Your

13   Honor.  One, we had attached a document to our venue

14   motion that lists Catholic Health Ministries' location

15   as Novi, Michigan, which is in the Eastern District.

16             Two, our allegations for this motion are

17   taken as true and Defendants have not even disputed that

18   CHM made the decision here.

19             And when venue is proper in this forum, as

20   it is here, Defendants have an incredibly high burden to

21   show that transfer to another forum is warranted.

22             The factors that courts are instructed to

23   consider by the transfer venue statute 1404(a) is the

24   convenience of the parties and the witnesses and the

25   interest of justice.

18

1           So let's look at the parties.  This is a

2     diversity action.  All of the Defendants are out of

3     state.  They have not made any showing that travel to

4     Grand Rapids would be less onerous than travel to

5     Detroit, which is an international airline hub.

6           As far as the Plaintiff is concerned, they

7     have no right to assert what would be more convenient

8     for the Plaintiff, and Plaintiff has at no point said

9     this forum would be inconvenient for her.

10          As far as the witnesses --

11          THE COURT:  She is a resident of the Western

12    District; is that correct?

13          MS. TUCKER:  She is, yes.

14          And as far as the witnesses that are

15    relevant to this action, there are two important things

16    to consider.

17          One, again, this is not a medical

18    malpractice case, so while there may -- and I repeat

19    "may" -- be some important people in the Western

20    District, this action, the claim occurred two and a half

21    years ago.

22          Defendants have made no showing that any of

23    the relevant witnesses are still at MHP or actually

24    reside in the Western District.

25          Most important, witnesses are going to be

19

1  those individuals who took part in the drafting and

2  adoption of these policies.

3         And with respect to the adoption, because

4  CHM is here, because, as we have stated in our

5  Complaint, all of the members of CHM are also members of

6  the Board of Directors of Trinity Health, again located

7  here, we have every reason to believe that the relevant

8  people for this action will either directly be in the

9  Eastern District at this time or will be travelling to

10 the Eastern District to conduct their affairs.

11        Defendants have also failed to show that in

12 any way the interest of justice would be better served

13 by transfer to the Western District of Michigan.

14        So in conclusion then, venue is, in fact,

15 proper in this forum because there can be no question

16 that the decision to, in fact, adopt the directives is a

17 substantial one with respect to the claims that we have

18 brought, not the claims the Defendants say we have

19 brought.

20        Defendants have not met their burden.  And

21 it is their burden, they have not met it, of showing

22 that transfer is warranted.  And thus, the action should

23 remain in the Eastern District.

24        THE COURT:  Who do you anticipate will be

25 your witnesses?

1              MS. TUCKER:  Well, first, the current

2    members or the past members of CHM we anticipate

3    calling.  Two, the members of Trinity Health as they are

4    the parent company of MHP.  And as the parent company,

5    they can be instructed to require that employees of MHP

6    appear in this Court.  And three, any witnesses that we

7    may bring.

8              As I said, this is not our burden.

9    Defendants want a transfer, so they must show that the

10   witnesses they want are, in fact, outside of this

11   District.

12             THE COURT:  Do you -- but my question is

13   really what witnesses are you going to have?  You're

14   going to have CHM, Trinity Health, are you going to have

15   the Plaintiff?

16             MS. TUCKER:  Yes, we will have the

17   Plaintiff.

18             THE COURT:  Anyone else?

19             MS. TUCKER:  Yes.  We will have multiple

20   representatives of USCCB we expect.  And we certainly

21   will have plenty of experts that we have already located

22   who are, in fact, in the Eastern District of Michigan to

23   explain what the care is that Plaintiff was supposed to

24   receive.

25             THE COURT:  And are you going to have

21

1   anybody from the hospital in the Western District?

2               MS. TUCKER:  We know that we will have one

3   person who is still there, but with respect to the

4   hospital and the treating physicians back in 2010, Your

5   Honor, we have not yet looked to see where their current

6   residences are.

7               THE COURT:  Are they going to be witnesses?

8               MS. TUCKER:  We expect them to be, yes.

9               THE COURT:  Okay.

10              MS. TUCKER:  Thank you so much.

11              THE COURT:  Do you wish to reply, but do not

12  reargue your motion.

13              MR. LEVASSEUR:  I will be brief, Your Honor.

14              I should point out, Your Honor, that the

15  physicians who work out of the hospital are not

16  employees of Mercy Health Partners.  As with most

17  hospitals, they're contractors so we can't control them.

18              It would be accurate to say that the parent

19  company of the subsidiary can be forced to bring a

20  witness in, which I believe that is the law, but, with

21  regard to this notion that experts are going to be used,

22  they haven't identified any experts, but the convenience

23  of an expert is probably the least of anybody's concern.

24  They're hired to come and give opinions and that is part

25  of the price of or cost of doing business in testifying

1    is sometimes it's in different locations.

2              But even if that was a factor, the Plaintiff

3    hasn't identified any experts that would be testifying.

4              But you know, the big assumption here that

5    Ms. Mollison or that Ms. Mollison or Mr. Urban or Mr.

6    Ladenburger ever stepped foot in the state of Michigan

7    in 2009 when the directives were adopted, that is

8    Plaintiff's burden.  That is Plaintiff's burden to

9    demonstrate that venue is proper in this District and

10   that they engaged in activities that would make it fair

11   for them to be hauled into this District to defend

12   actions that took place in 2010 in the Western District

13   of Michigan.

14             And however you frame the Plaintiff's

15   claims, whether it is a malpractice case, whether it is

16   simply a negligence case, all I can do is sum up and

17   refer to, again, the Plaintiff's Complaint.

18             The standards of paragraph 52:

19             The standard of medical care required MHP

20             to:

21             (A) to inform Plaintiff about her treatment

22                 options...

23             (B) to inform Plaintiff about the health

24                 risks...

25             (C) to inform Plaintiff about the fact if

23

1               she continued her pregnancy there was

2               virtually no chance that the fetus would

3               survive to term;

4          (D) to provide appropriate medical care to

5               Plaintiff.

6               All of that, you know, sums up the basis of

7     the claim.

8               Where the directives were all adopted or not

9     has no bearing on the ultimate allegations in this case;

10    that is, whether she received the appropriate standard

11    of care.

12              And they framed that issue, Your Honor.

13    That is an issue they framed with the activities of or

14    lack thereof of Mercy Health Care Partners of Michigan

15    in mind.  Those are the actions, from their own

16    Complaint, that they repeatedly go on about.

17              It is that what is important and those are

18    the witnesses.

19              And even if you were to find venue is proper

20    in this case and it is appropriate convenience, that is

21    who you should consider, people who actually have that

22    standard of care or didn't follow the standard of care.

23    They're in Muskegon.

24              And I should note that Plaintiff Counsel has

25    not addressed the fact of venue with regard to the U.S.

24

1  Conference of Catholic Bishops.  Venue has to be proper

2  as to them, and it has to be proper as to each and every

3  one of the individual Defendants, Your Honor.  Thank

4  you.

5              THE COURT:  All right.  Thank you very much.

6              Do you wish to reply?

7              MR. GETTO:  Actually, yes.

8              Very briefly, Your Honor, Cameron Getto on

9  behalf of the Conference of Catholic Bishops.

10             I think it is very important to have correct

11 on the record, Your Honor, that this Court is going to

12 be passing on the legal issues in this case according to

13 Michigan law, a tort case at its heart, and there is no

14 pendant federal tort law.

15             Assuming that Michigan law will apply to

16 this case, this is most certainly an action alleging

17 medical malpractice.  There can be no question that it

18 is.

19             Michigan statute 600.1483, and a number of

20 other statutes, govern what constitutes medical

21 malpractice cases.

22             The Supreme Court in Brian versus Oakpointe

23 Villa is a case that essentially states any time a

24 licensed health care provider is accused of malpractice

25 and medical issues are involved, you have a malpractice

25

1   case on your hand.

2              There is going to be a central issue, if we

3   ever get to the merits, which I'm not here to address

4   because we're asserting that personal jurisdiction

5   doesn't apply, but the point is this is definitely a

6   medical malpractice case under Michigan law.  I don't

7   think there is any reasonable argument to the contrary.

8              What they're trying to say is it is not a

9   medical malpractice case but what the Defendants did

10  caused medical malpractice to occur.  Under Michigan

11  law, that is a malpractice case, Your Honor.  Thank you.

12             MS. TUCKER:  Your Honor, may I briefly

13  reply?

14             THE COURT:  Are you going to say something

15  new that you didn't say before?

16             MS. TUCKER:   Yes.

17             THE COURT:   Okay.

18             MS. TUCKER:  One, to address his claims that

19  under Michigan law our claims are essentially ones for

20  medical malpractice, in the Bryant case, it sets forth a

21  two-part test for courts to use to determine whether an

22  action is one for medical malpractice or one for

23  negligence, and in that case, the threshold is whether

24  the claim is against a licensed health care provider or

25  is it against a nonmedical entity.  And if it is against

1    a nonmedical entity, that case says you can't even sue

2    it for medical malpractice under Michigan law.

3              So since the Conference of Catholic Bishops

4    and the individual Defendants are not medical providers,

5    they could not be sued for medical malpractice, and in

6    fact, have not been sued.  Thank you, Your Honor.

7              THE COURT:  Okay.  Thank you.

8              Now let's go to the Motion to Dismiss.

9              MR. GETTO:  Thank you, Your Honor.  I do

10   believe that we, all the parties have done an excellent

11   job of briefing this issue, so I'm not going to belabor

12   the issues that are raised in the briefs.

13             And I'm not going to go all through the

14   cases, although I do believe the briefs set forth that

15   virtually every single, if not every single, case cited

16   by Plaintiff is distinguishable for the unusual and

17   unique facts of this case.

18             Instead, Your Honor, what I would like to

19   focus on is kind of the bigger picture, the more global

20   picture.

21             There is a central flaw I think in the

22   idealogy or the methodology that Plaintiff is using to

23   pursue personal jurisdiction over the United States

24   Conference of Catholic Bishops.

25             What Plaintiff doesn't seem to understand is

27

1    because the USCCB is a professional organization, it

2    doesn't tell bishops what to do, bishops tell it what to

3    do.

4              Moreover, Plaintiff has completely neglected

5    to create any connection between the promulgation of

6    these directives, which occurred in Washington, DC --

7    entirely in Washington, DC -- and which were published

8    in Maryland and what occurred in this case.

9              Essentially, Plaintiff's central argument

10   was the Plaintiff was the victim of malpractice by a

11   physician who was an independent contractor of a health

12   group, that was in some way affiliated with a larger

13   parent organization, that was also a health group, that

14   was in some way a member of the USCCB.

15             With due respect to Plaintiff, there is not

16   a single case in any of these briefs that comes close to

17   addressing that tenuous of a connection.

18             And in fact, if we turn to some of the cases

19   in the Plaintiff's brief, like for example the Lanier

20   case, I think what we find is the opposite.  In every

21   single one of these cases, the connection was between

22   the plaintiff and the defendant in the case.

23             Here, we have no connection whatsoever

24   between the Plaintiff and the Defendants, and instead,

25   an attempt to chain together an intermediary connection

28

1    with other people in an attempt to create personal

2    jurisdiction in Michigan.

3              In Lanier, there was the attempt to make the

4    connection between Dr. Lanier and the Board of

5    Endotonics to a contractural arrangement whereby the

6    prestige of the Board's certification would be conferred

7    upon Dr. Lanier of Michigan in consideration of her

8    pledge to the Board's criteria for certification

9    eligibility.

10             Mainly, I mean, it is obvious that in this

11   case, the Board's contract with Dr. Lanier of Michigan

12   was for the purpose of establishing a business

13   relationship.  It is a contractural type of a claim.

14             I set forth in the long footnote on page 2

15   of my brief the recitation of each case that the

16   Plaintiff has cited and why that connection has nothing

17   to do with the connection in this case.

18             Again, each case cited by the Plaintiff is a

19   direct connection between the plaintiff and the

20   defendant.

21             I don't think that the Plaintiff seriously

22   contests general jurisdiction, although it appears that

23   a number of contacts, and I mean, in this day and age it

24   is impossible for an organization the size of USCCB not

25   to have some contact with Michigan on some occasions,

1    although they cite to some contacts, and none of them

2    come close to any of the analyses in any of the cases

3    that would give rise to a claim, in my view, for general

4    jurisdiction.

5              I'm not going to use up the Court's time

6    with that argument because I don't think it is being

7    meaningful contested at this time.

8              When we turn our attention, Your Honor, to

9    specific jurisdiction, again, the connection here

10   supposed by Plaintiffs and that is alleged by the

11   Plaintiff, doesn't involve the Plaintiff and the

12   Defendant.

13             Every single case having to do with specific

14   jurisdiction talks about the reason jurisdiction is

15   being conferred on the Court is because of the

16   connection between the plaintiff and the defendant.  I

17   think the concept is whether or not the actual subject

18   matter of the dispute occurred in Michigan.

19             And here, the USCCB didn't do anything in

20   Michigan.  It had no physical presence in Michigan.  It

21   committed no acts in Michigan.  There is just nothing.

22             And I believe this is a central flaw in

23   Plaintiff's case.

24             I don't believe they have in any way, shape

25   or form put together the argument that this Court has

1    personal jurisdiction at this time.

2             Now, I should throw in here at the end that

3    it was unclear to me why the Plaintiff argued waiver.

4             Now, we filed a special appearance, Your

5    Honor, in this case, and we made three things clear.

6    One, that we intended to contest venue.  Two, that we

7    intended to contest personal jurisdiction.  And three,

8    that we didn't intend to waive anything.  We were out

9    to be the first to the courthouse steps in arguing

10   venue, but we were placed in a position where we felt we

11   were obligated to respond.  So we responded.

12             When I then filed this motion, I received a

13   response that says, oh, I filed my own motion, you have

14   waived.  I don't believe that we waived anything.  This

15   was not a responsive pleading.  It is not a pleading at

16   all.  It is not even a substantial defensive move

17   because it is venue.  It is a procedural issue.

18             I would just ask that the Court disregard

19   that argument.  I think it is somewhat disingenuous that

20   our perceived constitutional rights to individuals and

21   organizations would argue that we have in some way

22   waived our right to contest personal jurisdiction in

23   this case, particularly under the circumstances and

24   given all of the trouble that we went to to make it

25   clear to everybody what we were doing and the fact that

1   nobody objected.

2          Thank you, Your Honor.

3          THE COURT:  All right.  Thank you.

4          MS. TUCKER:  So as Defendant ended on

5   waiver, I would like to start with the waiver issue.

6          We don't dispute what Defendant just said.

7   It did file a special appearance, and as it says now, it

8   says that it filed it so it can do a whole host of

9   things.  It wanted to preserve its defense of personal

10  jurisdiction.  It wanted to argue venue.  It didn't want

11  to waive anything.

12         One, special appearance does not contemplate

13  all these things.  It is for one purpose and that is to

14  preserve the defense of personal jurisdiction.

15         So when USCCB filed its special appearance

16  and said it was going to concur and then told Plaintiff

17  that it was going to file a response to its

18  Co-Defendant's motion, Plaintiff then, I think

19  understandably said we would like a chance to respond to

20  both you and your Co-Defendants.

21         But again, it was a response intended and

22  that USCCB's relief would be a concurrence, which is

23  something seeking concurrence, which is something

24  seeking the exact same relief as Co-Defendants but

25  perhaps for different reasons.

1          However, what USCCB did when it filed its

2     response, it asked for something that even its own

3     Co-Defendants didn't even ask for.  Instead of asking

4     for a change of venue, USCCB says it wants the case

5     outright dismissed because of improper venue.

6          That is a defense under Rule 12(b)(3).  The

7     federal rules say that you can either present the

8     defense of improper venue in an answer or in a motion

9     under 12(b).  Then the rules go on to say in 12(g) that

10    you're required to raise all of your 12(b) defenses in a

11    single motion.  Rule 12(h) then says if you don't, then

12    the defense that you failed to raise in that motion is

13    waived.

14          It cannot be seriously contended that the

15    response USCCB argued wasn't answered though it can only

16    be a 12(b)(3) motion since it did request dismissal for

17    improper venue.

18          However, Defendant states in its reply brief

19    on page 6 that it did not assert or request any relief

20    not already raised in its Co-Defendants' motion.  Yet,

21    on page 9 of its Co-Defendants' motion, in the

22    Conclusion section, the individual Defendants say

23    Defendants respectfully request that venue be

24    transferred to the Western District of Michigan.  That

25    is all they asked for.

33

1      However, on page 8 of USCCB's Motion, in its

2  Conclusion, it states that Defendant USCCB requests it

3  be dismissed from the case for lack of proper venue.

4  Alternatively -- alternatively -- the Conference concurs

5  in the request for transfer of venue by Co-Defendants.

6      Thus, USCCB itself recognizes that it is

7  both concurring and filing its own separate request for

8  relief.

9      And in our brief, we have cited cases from

10 the Sixth Circuit and across the country where a party

11 has filed a brief requesting dismissal for improper

12 venue and subsequently tried to file another brief

13 requesting dismissal for lack of personal jurisdiction

14 and courts have unanimously said you cannot do that.

15 The Sixth Circuit did not even allow a pro se defendant

16 who said, you know, you should construe it liberally,

17 courts, because I'm a pro se defendant, the Sixth

18 Circuit said, no, the rules are very clear and they do

19 not allow that.

20      So we think that Defendants have waived any

21 personal jurisdiction argument.

22      However, even if that is not what the Court

23 finds, personal jurisdiction is proper in Michigan for

24 the following reasons.

25      One, Defendants consistently tried to refer

34

1    to our claims as something completely novel and

2    unprecedented.  But Defendant has acknowledged here

3    today that USCCB is a professional association, and

4    there are a whole line of cases that we have cited in

5    our brief that stand for the proposition that when such

6    an association voluntarily undertakes the task of

7    drafting policies, standards, warnings for third parties

8    to use with the intent that the third parties use them,

9    and if the third party actually uses them and causes

10   another person harm, the association is liable for that

11   harm.  This is not new.  Nothing novel about our claim.

12            However, regardless of whether that is so,

13   there is certainly no novelty in the idea that in

14   out-of-state defendants that purposely directs its

15   out-of-state activities into the forum state, it can be

16   subject to jurisdiction in that forum state.

17            This has been the case since International

18   Shoe was decided over seven decades ago.

19            So when we look at International Shoe and

20   what the law is that the Sixth Circuit has set forth,

21   one, that the Defendant has purposely directed its

22   activities towards the forum.  Two, that the case arises

23   out of those activities.  And three, that jurisdiction

24   is, thus, reasonable.

25            So Defendant, I noticed, argued that the

35

1  cases require a defendant to have purposely directed its

2  activities towards a specific plaintiff.  That is not

3  the case, and there is no case that has stood for that

4  proposition.

5            What the cases say is the defendant has to

6  direct its activity towards the forum.  It also says

7  they arise from the second prong that connects these

8  activities to the plaintiff.

9            So we'll start looking at how Defendant has

10 purposely directed its activities to the state of

11 Michigan.

12            Purposeful is a synonym of intentional.

13 And that is why all the courts, from district courts all

14 the way up to the Supreme Court, focused on the

15 defendant's intent when doing the activity at issue when

16 deciding whether personal jurisdiction is proper.

17            And to show intent, the Supreme Court in

18 Asahi has stated if a defendant designs the product so

19 that it can go in the forum state, that is evidence of

20 intent.

21            So let's just look at some of the things

22 that Defendant USCCB has done to design its product for

23 implementation in the state of Michigan.

24            One, the language of the directives itself.

25 The directives, the full name of the directives are,

36

1    "Ethical and Religious Directives for Catholic Health

2    Care Services".

3              Thus, at the outset, it intended for its

4    directives to be implemented at Catholic hospitals.

5              Two, the language from the directives says,

6    Catholic health care services must adopt these

7    directives as policy and requires adherence to them

8    within the institution as a condition for medical

9    privileges and employment and provide appropriate

10   instruction regarding the directives for administration,

11   medical and nursing staff and other personnel.

12             Then it goes on in the directive that anyone

13   who is an employee of a Catholic health care institution

14   must respect and uphold the religious mission of the

15   institution and adhere to these directives.

16             There has been no dispute that the hospital

17   that Ms. Means went to is a Catholic health care

18   service.

19             So when it drafted this and said that

20   Catholic health care services must -- must -- adopt

21   these directives as policy, it clearly intended that

22   Catholic health care services in Michigan and elsewhere

23   would, in fact, adhere to them.

24             Next, at the end of the directives it says

25   that it is going to, in addition to it, any authority it

37

1   has and the hierarchy for that, Catholics in the United

2   States.  In addition to that, it is going to recommend

3   that the individual bishops that comprise the

4   organization implement those directives in their

5   respective dioceses.

6           Next, USCCB updates and clarifies its

7   directives, and with respect to this specific directive

8   at the heart of this case, the directive that prohibits

9   termination of viable pregnancies in all circumstances,

10  when there was a Catholic hospital in the state of

11  Arizona that adhered to the directives and was

12  confronted with the situation where a woman was 11 weeks

13  pregnant and had a heart condition that her physician

14  told her death was near certain if she continued the

15  pregnancy.  The hospital did not know what to do under

16  the directives and decided that the directives must

17  allow it to perform this life-saving procedure.  And so

18  that is what, in fact, it did.  A few months later,

19  USCCB then issued a written statement to clarify that

20  its directive does, in fact, not permit the life-saving

21  procedure at issue.

22          And then, according to its own news service,

23  provided that clarification to all of the bishops,

24  including the bishops with jurisdiction over the

25  hospital Plaintiff went to.

38

1          And lastly, let's not forget the obvious,

2    that USCCB's health care policies are not called

3    recommendations or guidelines, they are, in fact, called

4    the directives.  And by its own directives, a directive

5    is an order to do something.

6          The due process that's at issue in this case

7    protects defendants from random unforeseeable fortuitous

8    acts that it had no way of knowing whatever happens.

9          So in order for USCCB to prevail in this

10   case, it has to be that somehow randomly -- even though

11   it did draft directives and did tell all Catholic health

12   care services it did have to adhere to them, it did

13   provide the clarification on the directives at issue --

14   that even though it takes all of those steps, it is just

15   a random unforeseeable event that MHP, as a Catholic

16   health care service, went and adhered to the program

17   when it decided what treatment it was and was not going

18   to give to the Plaintiff.

19          USCCB's claim that it simply drafted the

20   directives, placed them in there and they somehow have

21   no action on USCCB's part is simply not credible.

22          And lastly, Defendant also attempts to say

23   that what MHP did was the unilateral act of a third

24   party; something it could not at all be responsible for.

25          And as I've just indicated, the directive

1   was specifically created for implementation at Catholic

2   health care services.

3           Michigan is home to the second largest

4   Catholic health care system in the country.  There is no

5   way that Defendant did not intend when it said in its

6   language that all Catholic health care services must

7   adhere to the directive, it did not expect the second

8   and largest health care system, including the hospital

9   Ms. Means went to, to adhere to those directives.

10          And to the extent the Court would like

11  further information on this issue, I would request an

12  opportunity to conduct limited discovery.

13          And one more point, Your Honor, and just to

14  address an argument that USCCB repeatedly raises in its

15  brief, I just want to be clear to the Court and to the

16  Defendants that this case is not an attack on USCCB's

17  religious freedom.  Certainly Ms. Means has no interest

18  in prohibiting USCCB from exercising its opinions and

19  Plaintiff Counsel at the ACLU certainly doesn't either,

20  but what we do take issue with and what is actually at

21  issue in this case is that they cannot make health

22  policy for implementation at hospitals open to the

23  public with the intent that the hospitals rely on that

24  policy where those policies are going to conflict with

25  the applicable standard of care and increase the risk of

1   patient harm.

2            And unfortunately, as in Ms. Means's case,

3   actually caused her not to be free of harm and that is

4   what we claim it did and that is all we're claiming.

5            So in conclusion, USCCB claims that despite

6   its language saying its directives must be followed by

7   Catholic hospitals, despite the fact that there are at

8   least 15 such hospitals in Michigan where the directives

9   are followed, and despite the fact that it was a

10  Michigan hospital's adherence to USCCB's policy that

11  caused Ms. Means's harm, again in Michigan, USCCB's

12  claims it would somehow be unfair for it to even have to

13  defend itself in a court in Michigan.

14           We respectfully disagree.  We believe that

15  it is more than fair because it is through no fault of

16  Ms. Means that when she went to the hospital and that

17  hospital, instead of providing her with the applicable

18  standard of care, adhered to USCCB's directive, as USCCB

19  instructed them to do.  That did not happen because of

20  something Ms. Means did, that happened because of what

21  USCCB did.

22           And for that reason, personal jurisdiction

23  is not only proper and reasonable, it is imminently

24  fair.   Thank you, Your Honor.

25                THE COURT:  Okay. Thank you.

41

1            Do you wish to reply?

2            MR. LEVASSEUR:  Yes, Your Honor.  Thank you.

3            I direct the Court's attention to the

4  affidavit of Linda Hunt that is attached to actually

5  both of the motions.  She is the Associate General

6  Secretary of the United States Conference of Catholic

7  Bishops and I think she has six pages of text that

8  explain why there is no connection between USCCB and

9  Michigan.

10            There can be no question that the USCCB is

11  not home in Michigan.  It is 500 miles away.  It has no

12  business presence here whatsoever.  It doesn't have an

13  office here.  It doesn't accept mail here.  It doesn't

14  have any landholdings here.  It has no property here.

15  There is simply no presence in Michigan that the USCCB

16  has or has had in any time in the distant past.

17            Under I think the traditional notion of

18  fairness and substantial justice, it is not appropriate

19  to haul the USCCB into court here in Michigan.

20            But more importantly, Your Honor, if you

21  review this Affidavit to which the ethical directives

22  are attached, you will find no directive that tells

23  anyone, health care provider or anyone else, to breach a

24  standard of care.

25            You will find no directive that tells anyone

42

1    to neglect their legal duty to a patient.  You will find

2    no directive that tells anyone that it is okay to harm a

3    patient if it is consistent with your religious beliefs.

4              Put simply, Your Honor, these don't really

5    say what the Plaintiff says they say.  And that is a

6    real problem with the case because these words are the

7    connection that Plaintiff is using to attempt to assert

8    both personal jurisdiction and venue in this case.

9              With due respect to the Plaintiff, these

10   don't say what they want the Court to believe they say

11   and they don't tell anyone to do anything wrong,

12   anything inconsistent with their legal obligation or

13   harm the Plaintiff.

14             And for Plaintiff to make that assertion,

15   that is simply a very cynical and, in my view, sinister

16   interpretation of what these ethical principles are.

17             These are the Catholic church's religious

18   philosophies. They're entitled to it and they're

19   constitutionally entitled to say we believe the

20   Catholics ought to behave this way.  But to then argue

21   that they somehow told the doctor to send a woman whose

22   water has broken and is going to lose a baby home, it is

23   far beyond the plausible boundaries of what these

24   ethical directives are, were ever intended to say or

25   could be reasonably interpreted to say.

43

1                    THE COURT:  I'm going to take your motion

2    under advisement and I will give you a written order.

3                    (Proceedings concluded at 3:15 p.m.)

4                    * * * * * * * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

1                 C E R T I F I C A T I O N

2                 I, CHERYL E. DANIEL, Official Federal Court

3     Reporter, after being first duly sworn, say that I

4     stenographically reported the foregoing proceedings held

5     on the day, date, time and place indicated.  That I

6     caused those stenotype notes to be translated through

7     Computer Assisted Transcription and that these pages

8     constitute a true, full and complete transcription of

9     those stenotype notes to the best of my knowledge and

10    belief.

11                          I further certify that I am not

12    of counsel nor have any interest in the foregoing

13    proceedings.

14

15            /S/

16            CHERYL E. DANIEL,

17            FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25